NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DONALD E. HERNLY, INC.,
Respondent.

No. 271, Docket 79–4110.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1979.

Decided Jan. 14, 1980.

Paul J. Spielberg, N. L. R. B., Wash-
ington, D. C. (John S. Irving, Gen. Counsel,

John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Alan Banov, Atty., N. L. R. B., Washington, D. C., on brief), for petitioner.

Howard H. Mattson, New York City (Louis C. Raegner III, New York City, on brief), for respondent.

Before MESKILL and KEARSE, Circuit Judges, and DOOLING, District Judge.*

KEARSE, Circuit Judge:

This is a petition by the National Labor Relations Board under section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e) (1976), for enforcement of an order issued against Donald E. Hernly, Inc. ("Hernly"). The Board's decision and order, reported at 240 N.L.R.B. No. 104 (1979), held that Hernly had engaged in three unfair labor practices in violation of section 8(a)(1) of the Act:[1] (1) threatening to withhold from eight of its employees two hours' "show up" pay previously authorized, and to discharge or lay off the employees, if they supported their union, (2) rescinding a promise to pay the two hours' "show up" pay, and (3) interrogating two employees concerning certain charges filed with the Board. We hold that the Board's decision is not supported by substantial evidence on the record and we therefore deny enforcement of the order.

I

Hernly is a corporation engaged in construction contracting. In 1977 it was awarded a subcontract for the driving of steel sheet piling and other work on the Red Hook Sewer Project in Brooklyn, New York. From March to mid-November, 1977, Hernly employed on that job two crane operators, two oilers, and two crews, each consisting of a foreman and four dockbuilders. The crane operators, oilers, and foremen were guaranteed a forty-hour work week under their union contracts. The dockbuilders' contract contained no such guarantee and they were paid only for hours worked.

This proceeding arose out of a dispute over pay for the eight dockbuilders with respect to Friday, October 28, 1977, when all work on the Red Hook project was suspended for the day at the behest of the project's general contractor in observance of the death of one of its principals. On Thursday, October 27, Edwin Ortiz, the dockbuilders' shop steward, having learned that the employees having the 40 hours' guaranteed week would be paid for Friday, October 28, asked Hernly superintendent Gary Galimidi whether the dockbuilders too would be paid for Friday, October 28. Galimidi said that he would find out; he and Ortiz had several conversations on October 27 on this question. After consulting with Hernly's president, Galimidi told Ortiz that the dockbuilders would be paid for two hours; he then noted this on the employees' timecards and notified Hernly's office of the situation. Ortiz, however, responded that the dockbuilders thought they were entitled to a full day's pay, that he could not accept just two hours' pay, and that he would get the dockbuilders union's business representative, Arthur Harkin, to come to the jobsite to decide what to do. The matter remained unresolved until the union representative arrived, which was not until Monday, October 31.

---

* Honorable John F. Dooling, Jr., Senior Judge of the United States District Court for the Eastern District of New York, sitting by designation.

1. Section 8(a)(1) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(1) (1976), provides:

 It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . ..

Section 7 of the National Labor Relations Act, as amended, 29 U.S.C. § 157 (1976), provides in part:

 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ..

On October 31 there was a conversation among Harkin, Ortiz and Galimidi, part of which was heard by Henry Bonne, one of the foremen. Harkin demanded that the dockbuilders be paid for eight hours for October 28. At the hearing before the Administrative Law Judge ("ALJ"), Galimidi testified that he told Harkin that the firm was willing to offer two hours' pay, but that eight hours would be a drastic economic blow. Galimidi tried to motion Harkin away from the dockbuilders, but Harkin refused to follow and said to the dockbuilders: "I'm going to get you the eight hours. Remember, you're working for me and you don't work for him." (Joint Appendix ["A."] at 204.) At this statement, Galimidi testified, "I blew my top on that because this is a very flagrant statement, especially when said in front of me. . . . I therefore told Mr. Harkin that if this is the case, I might as well shut the job down." (*Id.*) Galimidi testified that he felt the statement was "flagrant" in front of him because it implied to the employees that they did not have to heed instructions coming from him, the job superintendent. (A.205.) He told Harkin and Ortiz that he would call the office and have the two hours stricken from the timecards.

Ortiz and Harkin gave a somewhat different version of the conversation. Ortiz testified that Galimidi said that he was going to take away the promised two hours' pay and lay the men off because the union had been brought in. (A.47–48.) Harkin supported this version. He testified that Galimidi said: " 'You went to the union on me.' He says, 'I give you that two hours out of the goodness of my heart. I'm taking it away from you right now.' . . . 'I'll shut this job down any time I want. You're not telling me how to run the job. I could lay it off, I might stop it and shut the job down and lay these men off.' " (A.148–49.) Harkin denied that he had said, in words or in effect, that the men worked for him and not for Galimidi. Ortiz testified that he did not recall that Harkin had made

such a statement, although he allowed that he himself might have said that they work "under union policy." (A.75.)

Galimidi denied having made any mention of the union. Bonne, who was present or nearby during the conversation among Harkin, Ortiz and Galimidi, apparently did not hear Galimidi say anything about the union. He could not recall definitely whether or not Harkin had stated that the dockbuilders worked for the union and not for Galimidi, but did recall that Galimidi said something about "taking away my powers." (A.103–04.)

Galimidi did in fact have the two hours stricken from the dockbuilders' timecards and the dockbuilders were paid nothing for October 28. The dockbuilders' union thereafter filed a grievance, which was denied by a labor-management panel at the first step of the grievance procedure.

On November 14, 1977, some two weeks after the pay incident, the dockbuilders were laid off for lack of work. On November 16 their union filed an unfair labor practice charge with the Board, alleging that the layoff was because of the employees' protected union activities. Around Thanksgiving, Edward Gaidon, Hernly's president, telephoned two of the dockbuilders, Donald Carman and Aldo Delu, at their homes to ask them about the charge. Each conversation was informal and quite short. Carman testified that he recognized Gaidon's voice, having previously spoken on the telephone with him quite often. Gaidon asked Carman only whether he knew anything about the charge filed by the union, and, according to Carman's affidavit although Carman had no recollection of it by the time of the hearing, whether Carman personally had made the charge. Carman replied that he had not made the charge personally and did not know much about it. Carman stated that Gaidon made no threats or requests to drop the charge, and seemed in a normal, calm mood.[2] The conversation

---

2. During the conversation, Gaidon told Carman that he did not know whether he could hire the dockbuilders back while the charge was pending. Carman described his reaction as follows:

> I did not take that as a threat.

lasted less than one minute. The other Gaidon call, to Delu, apparently was even shorter. Delu, who also recognized Gaidon's voice, testified that he was asked only whether he knew anything about the charge, and that he replied that he did not.[3]

Eventually a complaint was filed by the Board. The charge that the layoff was an unfair labor practice was dropped, and a hearing was held before the ALJ on three other claims that the Act had been violated: (1) by Galimidi's remarks during the October 31 conversation, (2) by the withdrawal of the promised two hours' pay, and (3) by Gaidon's interrogation of the employees.[4]

*The Decision of the Administrative Law Judge*

In a written opinion, the ALJ dismissed the complaint in its entirety. After describing the testimony given at the hearing, the ALJ first addressed himself to the question of which version of the October 31 conversation to accept in determining the motivation for Galimidi's statements. He made specific assessments of the respective credibilities of the principal witnesses, based in large part on his observation of them at the hearing. The ALJ expressly discredited Ortiz' testimony, finding him a "cautious, defensive witness whose memory was so poor" that he had to be led, and whose testimony at times was "contradictory" and "less than forthright." (A.275.) Harkin was found to be "evasive on cross-examination," and the ALJ stated, "I specifically do not credit his denial that he said something to the effect that the men worked for him and not for Galimidi." (*Id.*) He also expressly "discredited the testimony of Ortiz and Harkin on the question of [Galimidi's alleged reference to] bringing the Union in." (A.278.) Galimidi, on the other hand, was found by the ALJ to be "a

forthright and candid witness" whose extensive examination did not reveal any contradictions or inconsistencies. The ALJ concluded, "I therefore find his testimony with respect to disputed points to be credible." (A.275.) The ALJ found Galimidi's testimony further supported by that of Bonne.

Based on these evaluations, and as well on the fact that Ortiz had told Galimidi on October 27 that he was bringing the union in, the ALJ concluded that Galimidi's statements on October 31 were not motivated by hostility toward the union. He found that the statements were not intended as threats, were not perceived by the employees as threats, and had no intimidating effect. The ALJ stated that the effect of the remarks on the employees

> was less than overpowering. Ortiz testified that everybody expected that they would get a full day's pay for the 28th. . . . It is clear that the employees were not upset by Galimidi's histrionics. In the circumstances of this case this is not surprising. From the testimony of Ortiz, Bonne, and the others, it is evident that they expected the Union to take care of them as it always had in the past.

(A.276.)

As to the actual withdrawal of the promised two hours' pay, the ALJ again found no anti-union motivation. He determined that Galimidi withdrew the promise not because Ortiz brought the union in, but because the promise was not acceptable to the union and the employees. "They wanted eight hours and were not, on the morning of October 31, going to settle for less." (A.278.)

Finally, as to the interrogation, the ALJ found that the conversations were not of such a nature as to violate section 8(a)(1). His reasoning was as follows:

---

> That was just a statement from the man saying that as long as these charges were pending he did not know if he could hire us back.
>
> In other words, he would have to contact his lawyers and find out whether it was a proper thing to do to hire us back or not to hire us back.
>
> I did not take that as a threat.

(A.121–22).

**3.** Delu also thought Gaidon mentioned something about getting an attorney to fight the charge.

**4.** The claim based on the interrogation did not appear in the original complaint but was added at the hearing.

In evaluating this incident, I have considered the background, the nature of the information sought, the identity of the questioner, the place and method of the interrogation, and the truthfulness of the reply. In this case there is, as I have found, no background of union animus or hostility.[5] Indeed the questioner explained to Carman and Delu that he had never received such a charge before. The nature of the information sought was the basis for the charge and whether the individuals had personally filed them. There was no indication in these questions of threats or coercion. Each of the witnesses who testified had been members of the Union for some years and the Union has had contracts with Respondent for years. This is not the kind of situation where a union is organizing and the information sought deals with union membership or organizational activities. It is true that the questioner was the Company's president, but the witnesses gave no indication that they were in awe of him. They both had had numbers of telephone calls from him and seemed on relatively familiar terms with him. The employees were interrogated informally, over the telephone, in their own homes. The replies were truthful and the evidence shows that the employees treated the affair casually and without fear.

(A.278–79.)

*The Decision of the Board*

The Board, acting through a three-member panel, accepted the ALJ's credibility findings but rejected the conclusions that no violations of the Act had been proven. The Board found violations in Galimidi's statements, in the withholding of the two hours' pay, and in the interrogation.

As to Galimidi's remarks, the Board stated as follows: "With respect to the allegation that Respondent threatened not to pay employees their previously authorized 2 hours' wages and at the same time threatened them with discharge, layoff, and other reprisals if they supported the Union, we find that such conduct inhibited employees in the exercise of their Section 7 rights . . . ." (A.294–95.) The Board found that the threats had a "coercive and unlawful effect" on the employees. (A.295.)

As to the withdrawal of the promised two hours' pay, the Board stated as follows:

It was only after the employees expressed dissatisfaction with the arrangement and called in the Union's business representative for further action that Galamidi [*sic*] withdrew his promise to pay the 2 hours' wages. Clearly, Galamidi's [*sic*] handling of this matter interfered with the employees' rights to act together for mutual aid or protection . . . . .

(A.295.)

As to the interrogation, the Board held that the "facts" that the questioning was "devoid of threats or coercion," and " 'the employees treated the affair casually and without fear,' " were irrelevant. (A.296.) The Board stated that the proper test was whether the employer "engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights." (*Id.*) The Board stated that the conversations had interfered with the employees' rights to file charges and to give testimony in support thereof.

The Board ordered Hernly to cease and desist from the specified unfair labor practices and from interfering with employees' rights in any like or related manner, and to make the dockbuilders whole for the promised pay. The Board then brought this petition to enforce its order.

## II

On review, the Board's findings are entitled to deference if they are supported

---

5. The General Counsel had sought through testimony by Ortiz to establish two earlier incidents that he contended showed a background of hostility by Hernly against the union. Cross-examination of Ortiz revealed that there was little, if any, substance to the complaints described, and the ALJ concluded, "I cannot find that these incidents show that Respondent or its superintendent held convictions or had expressed views which indicated hostility to the Union, or an intent to discourage membership in it." (A.272.)

by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The fact that the ALJ reached conclusions contrary to those of the Board does not modify our standard of review. Our function in the case of such disagreement is not to weigh the competing views to see which is the more compelling. Our mandate is, as ever, to review the record to determine whether or not there is any substantial evidence supporting the Board's views; if there is, those views must prevail. *Id.* at 496, 71 S.Ct. 456.

■ Nevertheless, the findings of the ALJ are a part of the record that must be considered by the reviewing court in assessing the substantiality of the support for the Board's findings. This is especially true where the findings hinge principally on questions of the credibility of the witnesses. The Supreme Court set down the framework as follows:

> [T]he plain language of the statutes directs a reviewing court to determine the substantiality of evidence on the record including the examiner's report. . . .
>
> \*   \*   \*   \*   \*   \*
>
> . . . Nothing in the statutes suggests that the Labor Board should not be influenced by the examiner's opportunity to observe the witnesses he hears and sees and the Board does not. Nothing suggests that reviewing courts should not give to the examiner's report such probative force as it intrinsically commands.
>
> . . .
>
> \*   \*   \*   \*   \*   \*
>
> . . . The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.

*Universal Camera Corp. v. NLRB, supra,* 340 U.S. at 493–96, 71 S.Ct. at 468–469. *See NLRB v. Jamaica Towing, Inc.,* 602 F.2d 1100, 1103 (2d Cir. 1979).

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights to engage in concerted activities for the purpose of mutual aid or protection. Section 8(c), 29 U.S.C. § 158(c), provides that the mere expression of views, without threats of reprisal or force or promise of benefit, is not an unfair labor practice.

■ In the present proceeding the findings as to whether or not Galimidi's remarks constituted threats or interference with union activity in violation of section 8(a)(1) depend principally on a determination of what was actually said by Galimidi and what was said by Harkin in the October 31 conversation. Since the testimony was conflicting, assessment of the credibility of the witnesses was crucial. Ortiz and Harkin attributed express anti-union statements to Galimidi. Galimidi denied these, and Bonne, whom the ALJ found to be a disinterested witness, did not hear the union mentioned. The question whether to believe Ortiz and Harkin on the one hand, or Galimidi on the other, was one the ALJ was in the best position to answer. He did so by accepting Galimidi's testimony and expressly rejecting that of Ortiz and Harkin, giving a persuasive exposition of his reasons. His conclusions that, for example, Galimidi was "forthright," whereas Ortiz was "less than forthright" and Harkin was "evasive," could reasonably be reached only by one having the opportunity to observe the witnesses.

The Board did not have this opportunity, and stated that it did not overrule the ALJ's credibility findings. The Board nevertheless proceeded to rely on discredited testimony and to misread the credited testimony in reaching its conclusion that Galimidi threatened the employees with "reprisals if they supported the Union." The Board mentions Galimidi's testimony in connection with this finding, but Galimidi, who was found credible by the ALJ, testified that he did not speak with the men about the fact that the union was brought in. The only testimony that Galimidi's statements were made because the union was brought in was that of Ortiz and Har-

kin. The ALJ expressly rejected this part of their testimony as unworthy of belief.

Apart from the discredited testimony of Ortiz and Harkin, the record contains no support for the Board's finding of anti-union motivation. The record reveals instead that Ortiz told Galimidi on October 27 that he would bring the union in, and this produced no outburst from Galimidi, no rescission of the offer to pay two hours' wages, no threat of layoffs; the question simply remained unresolved. On October 31, the record shows, Galimidi talked with the union representative, explained to him why eight hours' pay was not feasible, and tried to motion him away from the employees for private conversation. It was only after Harkin made the statement that Galimidi felt challenged his managerial authority that there was any outburst or any withdrawal of the two hours' pay. We find that there is not substantial evidence on the record to support the Board's conclusion that Galimidi threatened reprisals for bringing in the union.

Nor is there substantial evidence on the record to support either the Board's finding that Galimidi's statements had a "coercive and unlawful effect," (A.295), or its argument to this Court that the statements had a "tendency in the totality of the circumstances to intimidate" the employees. (Brief at 9.) So far from supporting the view that the employees feared that they would lose the two hours' pay or be laid off, Ortiz' testimony was that they actually believed after Galimidi's outburst that they would receive *eight* hours' pay ("Everybody expected to get the day's pay" (A.78)); and they "took it for granted" that they would not get laid off. (A.80.) Indeed, the employees apparently viewed the interchange as normal give-and-take: Ortiz testified, "We played the wait and see game." (A.78.) Further resort to the union was not likely to be, nor was it, inhibited, for after the two hours' wages were not paid the employees had the union file a grievance, again, according to Ortiz, "playing a waiting game to see what was going to develop." (A.80–81.)

The Board's finding that the actual rescission of the promise to pay two hours' wages interfered with the employees' section 7 rights similarly lacks support in the credible evidence of record. The Board imputes anti-union motivation to Galimidi by stating that "[i]t was only after the employees . . . called in the Union's business representative" that the offer was rescinded, and that this "[c]learly" had interfered with the employees' rights. (A.295.) These conclusions ignore the full sequence of events disclosed by the credible evidence, discussed above, as well as the ALJ's finding that Galimidi withdrew the promise "because it was not acceptable to the Union." The Board's findings as to the cause and the effects of the withdrawal of the promise are not supported by substantial evidence on the record as a whole.[6]

---

6. The decision in *NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98–99 (5th Cir. 1970), does not advance the Board's cause. The Board quotes *Dothan Eagle* as follows:

[W]henever the employer by promises or by a course of conduct has made a particular benefit part of the established wage or compensation system, then he is not at liberty unilaterally to change this benefit either for better or worse during [a] union campaign or during [a] period of collective bargaining. Both unprecedented parsimony and deviational largess are viewed with a skeptic's eye during the tensions of organization, recognition and bargaining. . . . These unilateral blandishing acts of the employer tend to interfere with the exercise of free choice by the employees which is an important raison d'etre of contemporary labor policy.

(Brief at 14.) The inapplicability of this statement to the present proceeding is obvious. There is no indication that the events here occurred during a union campaign or period of collective bargaining. More importantly, the offer of two hours' pay (persistently rejected by the employees in their demand for eight hours' pay, according to all the witnesses), was not "part of the established wage or compensation system." Other portions of the *Dothan Eagle* opinion highlight the importance of this factor. For example:

In those cases where the employer was found guilty of an unfair labor practice for withholding benefits during the campaign period or during the process of collective bargaining, the basis of the charge was a finding that the employer had changed the established structure of compensation.

■ The Board's finding that Gaidon's interrogation of Carman and Delu violated the Act must also be rejected, both because it applied an unacceptable standard of law and because its factual premise is unsupported by the record. The test for determining when an employer's interrogation of an employee violates section 8(a)(1) was set down by this Court in *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964), and has been followed many times. *See, e. g., NLRB v. Monroe Tube Co.*, 545 F.2d 1320, 1328 (2d Cir. 1976); *Trico Products v. NLRB*, 489 F.2d 347, 352 (2d Cir. 1973) (test "applied in cases too numerous for citation"); *NLRB v. General Stencils, Inc.*, 438 F.2d 894, 899 (2d Cir. 1971); *NLRB v. Dorn's Transportation Co.*, 405 F.2d 706, 713–14 (2d Cir. 1969); *NLRB v. Lorben Corp.*, 345 F.2d 346 (2d Cir. 1965). In *Bourne*, we held that interrogation which does not contain express threats is not an unfair labor practice unless certain "fairly severe standards" are met showing that the very fact of interrogation was coercive. The factors to be examined include

(1) The background, i. e. is there a history of employer hostility and discrimination?

(2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?

(3) The identity of the questioner, i. e. how high was he in the company hierarchy?

(4) Place and method of interrogation, e. g. was employee called from work to the boss's office? Was there an atmosphere of "unnatural formality"?

(5) Truthfulness of the reply.

332 F.2d at 48.

The ALJ faithfully applied the *Bourne* standards in finding that the questioning was not coercive. (1) He found that proffered evidence of employer hostility was not credible and that there was "no background of union animus or hostility."

(A.278.) (2) He found that the only information requested was the basis for the charge and whether the individuals called had filed it, and that "[t]here was no indication in these questions of threats or coercion." (*Id.*) (3) He found that although the questioner was the president of Hernly, Carman and Delu had no particular awe of him, having had numbers of telephone calls from him previously and seeming to be "on relatively familiar terms with him." (A.278–79.) (4) He found that the questioning was informal, each employee being reached by telephone in his own home. (5) He found the employees' "replies were truthful and the evidence shows that the employees treated the affair casually and without fear." (A.279.) In short, the ALJ found that not one of the five *Bourne* tests revealed any inherent coercion.

The Board apparently accepted these findings as "facts," but termed ALJ's reliance on the facts misplaced, saying the test is whether the interrogation "*tends to interfere* with the free exercise of employee rights." (A.296; emphasis added.) Whether or not the Board believed it was applying this tendency test when it then proceeded to find that the interrogation "interfered," is unclear.

In support of enforcement, the Board argues that the interrogation "*could* have had the tendency to '[interfere] with these employees' rights.'" (Brief at 17; emphasis in original.) A principle that there is a violation despite the absence of any of the *Bourne* factors merely because conduct "*could*" have a "tendency" to interfere comes far closer to a *per se* rule against interrogation than we believe is appropriate. We continue to adhere to the standards set down in *Bourne*, and we find that the record in these proceedings does not contain substantial evidence to support conclusions contrary to those of the ALJ, or to support the view that the interrogations in any way interfered with employee rights.

The Board's petition for enforcement is in all respects denied.

434 F.2d at 98. In the present case it is clear that the offer of two hours' pay was nothing

more than an ad hoc response to an unusual situation.