104 F.3d 353
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
N.R. AUTOMOTIVE, INC., d/b/a Metro Toyota, Respondent.
 No. 96-4050.
 United States Court of Appeals, Second Circuit.
 Nov. 25, 1996.
 
 Appearing for Petitioner: Richard A. Cohen (Frederick L. Feinstein, Linda Sher, Aileen A. Armstrong; National Labor Relations Board, Washington, D.C.)
 Appearing for Respondent: Perry S. Heidecker (Milman & Heidecker, Lake Success, New York)
 NLRB
 ORDER ENFORCED.
 Before MESKILL, CALABRESI and CABRANES, Circuit Judges.
 
 
 1
 UPON CONSIDERATION of this petition for enforcement of an order of the National Labor Relations Board, it is hereby
 
 
 2
 ORDERED, ADJUDGED, AND DECREED that the order of the Board be and hereby is ENFORCED.
 
 
 3
 The National Labor Relations Board (the "Board") petitions for enforcement of a July 31, 1995 order in which it found that Respondent N.R. Automotive, Inc. d/b/a/ Metro Toyota ("Metro") violated § 8(a)(5) and (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(5) and (1). Specifically, the Board found that Metro had breached its obligation to bargain with the employees' union when it terminated employees without regard to existing layoff criteria. We agree and enforce the order of the Board in its entirety.
 
 
 4
 The ALJ found the following facts. This case arises from the takeover of a Toyota automobile dealership located in New Rochelle, New York. In 1988, the dealership was purchased and operated by the Tri-Star Automotive Group ("Tri-Star"). Tri-Star's service-department employees were represented by Local Lodge 447 of the International Association of Machinists & Aerospace Workers ("Local 447"). On February 14, 1992, shortly after Tri-Star filed a Chapter XI bankruptcy petition, an automobile industry executive named Don Lia agreed to purchase the dealership. Between April 29 and May 11 of that year, Lia caused Metro to be formed. On August 17, 1992, the deal closed and Metro formally took over the dealership.
 
 
 5
 While the deal was pending, Lia assigned one of his executives, Wayne Siegel, to work at the dealership. From mid-May of 1992, Siegel was present at the facility on a full-time basis to ensure that things were being run correctly. According to Siegel, this was done at the insistence of Chemical Bank ("the Bank") as a condition of its continuing to fund Tri-Star during the interim period before the closure. Siegel, however, admitted that he had no communications with the Bank during this period, and that he reported regularly and exclusively to Lia. In late June or early July of that year, Siegel told Tri-Star service manager Micky Blank that Metro intended to retain him as service manager.
 
 
 6
 At some point prior to July 13, Tri-Star eliminated dental coverage for all of its employees. Several employees complained to John Otero, a business representative of Local 447. On July 13, Otero visited the facility and was told by Blank to speak to Siegel because Siegel was the new owner. Siegel told Otero that he was the general manager of Metro, and that he believed that Metro would take over the dealership in a week or two. Otero asked Siegel if Metro would recognize the Union's collective bargaining agreement. Siegel answered that he would honor the contract with the exception of its seniority clause.
 
 
 7
 During the first week of August, Lia informed Siegel of the closing date for his purchase of the dealership. Blank then called a meeting of all the service-department employees. Blank told the employees that it was now certain that Lia would be purchasing the dealership. He then told them that they would all be retained and that everything, including benefits, would be the same under the new owner, except for the name on the building. On August 13, Blank held another meeting with the service-department employees, and made similar statements.
 
 
 8
 On August 14, 1992, without prior bargaining between Metro and Local 447, Blank told three employees in the service department that they would not be retained. Two of these employees, Hession and Murray, filed grievances with Metro. On August 31, Local 447 filed an unfair labor practice charge with the NLRB, alleging that Metro was violating § 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the union.
 
 
 9
 On November 19, 1992, all twelve remaining service technicians agreed to be represented by Local 355 of the United Service Workers of America ("Local 355"). On January 1, 1993, Metro and Local 355 executed a collective-bargaining agreement effective through December 31, 1995. After the Board issued its decision and order, Local 447 disclaimed all interest in representing these employees, though it did expressly retain the right to represent Hession and Murray before the Board.
 
 
 10
 This court has jurisdiction over petitions for enforcement of final orders of the Board pursuant to § 10(e) of the Act. 29 U.S.C. § 160(e). "On review, the Board's findings are entitled to deference if they are supported by substantial evidence on the record considered as a whole." NLRB v. Donald E. Hernly, Inc., 613 F.2d 457, 461-62 (2d Cir.1980).
 
 
 11
 A party can become a successor employer with an obligation to bargain, prior to taking actual control of the predecessor, where it assumes de facto control over the predecessor and, during its period of de facto control, it retains the predecessor's employees and otherwise continues to run the business substantially as it functioned under the predecessor. Sorrento Hotel, 266 N.L.R.B. 350, 1983 WL 24960, * 10-* 12. This duty to bargain, however, may be excused if "the underlying problem is not amenable to resolution through the bargaining process," Olivetti Office U.S.A., Inc. v. NLRB, 926 F.2d 181, 186 (2d Cir.), cert. denied, 502 U.S. 856 (1991) (citation and internal quotation marks omitted), or if the employer is faced with "compelling economic circumstances," Lapeer Foundry & Mach., Inc., 289 N.L.R.B. 952, 1988 WL 214127, * 3. Metro also asserts that Local 447's disclaimer of interest in representing Metro's employees precludes it from representing Hession and Murray.
 
 
 12
 Here there is no question that the dealership continued to run much as before, with the same complement of employees, during the period between Siegel's arrival at the dealership and August 17, when Metro took formal control. Accordingly, we are left to determine (1) whether the Board erred in finding that Metro had in fact established "de facto control over the facility" prior to firing Hession and Murray; (2) whether the Board erred in determining that Metro's duty to bargain was not otherwise excused; and (3) whether Local 447's disclaimer absolved Metro of the obligation to bargain.
 
 
 13
 1. Metro Incurred a Bargaining Obligation by Assuming De Facto Control Over the Dealership Prior to the Closing
 
 
 14
 The ALJ determined that Metro had assumed de facto control over the dealership before it fired Hession and Murray on August 14, 1992. We find that the ALJ's decision is supported by substantial evidence.
 
 
 15
 Perhaps most significantly, the record before the ALJ showed that Siegel, Metro's Vice President, exercised significant authority at the dealership on Metro's behalf long before Hession and Murray were terminated. First, Siegel admitted that he was at the dealership full-time beginning in mid-May to "make sure that things were taken care of on a day to day basis," and to ensure the implementation of "whatever financial policies could be put in place to at least limit the loss." Second, while Siegel stated that he was there at the insistence of the Bank, he admitted that the Bank "just wanted to know that an automobile person was there conducting business the way an automobile dealership should operate." Third, Siegel conceded that during this period he had no contact or communication with the Bank, but that he reported to Lia on a regular basis. Finally, Siegel's interactions with union representative Otero indicate both that he exercised significant managerial authority and that he did so on Metro's behalf. When Otero visited the dealership on July 13 to discuss Metro's dental plan, Blank directed him to Siegel as the new owner. Siegel informed Otero that Metro would be taking over the dealership and discussed with Otero whether Metro would honor Local 447's contract with Tri-Star. On these facts, we have no difficulty upholding the ALJ's finding that Siegel exercised control over the dealership on Metro's behalf.
 
 
 16
 Other evidence also supported the ALJ's determination that Metro had assumed control of the dealership at the relevant time. Before it fired Hession and Murray, Metro had entered a purchase agreement with Tri-Star, had acquired all the licenses it needed to operate the business, and had informed Blank that he would be retained as service manager.
 
 
 17
 There was therefore substantial evidence in the record to support the ALJ's (and the Board's) finding that Metro exercised de facto control over the facility before it terminated Hession and Murray. Metro therefore breached its obligation to bargain when it fired these employees.
 
 
 18
 2. Metro Was Not Otherwise Excused From Its Duty To Bargain
 
 
 19
 Because Metro fired employees without bargaining with the union when it had an obligation to do so, we must find it in violation of the Act unless it can show that it was otherwise excused from this duty. Metro contends that it was so excused on two separate grounds. First, Metro points to a Board decision finding that bargaining is not required if "the underlying problem is not amenable to resolution through the bargaining process." Olivetti, 926 F.2d at 186 (citation and internal quotation marks omitted). Metro maintains that the decision to fire Hession and Murray was such a decision because the two technicians were incompetent. But as the ALJ noted, "the Union may have been willing to sacrifice wage increases or some other benefits, in order to save employees' jobs." The layoff was thus clearly amenable to resolution through bargaining. Second, Metro contends that a duty to bargain may be excused where the employer is faced with compelling economic circumstances. Lapeer, 1988 WL 214127, at * 3. Yet Blank explicitly stated that his reduction in staff was motivated by his desire to increase the pay of the remaining technicians. Accordingly, we believe that no compelling economic circumstances existed here.
 
 
 20
 In sum, Metro's duty to bargain was not excused on other grounds.
 
 
 21
 3. We Lack Jurisdiction to Consider Issues Arising out of Local 447's Disclaimer
 
 
 22
 Metro additionally contends that the Board's order is incorrect insofar as it requires Metro to bargain with Local 447. It points out that Local 447 disclaimed its interest in representing Metro's employees, ceding that right to Local 355. Metro, however, did not submit Local 447's letter of disclaimer to the Board. We are "without jurisdiction to consider an issue not raised before the Board if the failure to do so is not excused by extraordinary circumstances." EEOC v. Federal Labor Relations Auth., 476 U.S. 19, 23 (1986) (citation and internal quotation marks omitted). While the letter was written subsequent to the Board's decision, we find that this does not constitute an "extraordinary circumstance," given that Metro could have filed a post-decisional motion asking the Board to reconsider its remedial order based on the letter. We note, however, that the Board concedes that the disclaimer letter and its significance can be raised in a subsequent Board compliance proceeding.
 
 
 23
 We have examined all of the respondent's other contentions, and find them to be without merit. We therefore enter a judgment enforcing the Board's order in full.