The CITY OF NEW YORK, Plaintiff,

v.

The UNITED STATES DEPARTMENT OF TRANSPORTATION and the Research and Special Programs Administration of the United States Department of Transportation, Defendants,

and

Arkansas Power & Light Company, Baltimore Gas & Electric Company, Duke Power Company, GPU Nuclear Corporation, Louisiana Power & Light Company, Mississippi Power & Light Company, Pennsylvania Power & Light Company, Public Service Company of Colorado, Public Service Electric & Gas Company, The Connecticut Light & Power Company, Western Massachusetts Electric Company, Wisconsin Electric Power Company, and The State of Connecticut, Defendants–Intervenors.

No. 87 Civ. 1443 (MGC).

United States District Court,
S.D. New York.

Dec. 8, 1988.

Peter L. Zimroth, Corp. Counsel of City of New York, New York City, for plaintiff; Stephen P. Kramer, Andrew Schwartz, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City by Paul K. Milmed, Asst. U.S. Atty., and George W. Tenley, Jr., Chief Counsel, Barbara Betsock, Sr. Atty., Research and Special Programs Admin., U.S. Dept. of Transp., for defendants.

LeBoeuf, Lamb, Leiby & MacRae, New York City by Harry H. Voigt, Leonard M. Trosten, Mindy A. Buren, Judith Fox, for defendants-intervenors Arkansas Power & Light Co., et al.

Joseph I. Lieberman, Atty. Gen., Hartford, Conn. by Carl J. Schuman, Asst. Atty. Gen., and Edward H. Burnbaum, Lynch Rowin Burnbaum & Crystal, P.C., New York City, for defendant-intervenor State of Conn.

## OPINION AND ORDER

CEDARBAUM, District Judge.

This is the latest skirmish in an ongoing battle between the United States Department of Transportation ("DOT" or "the Department") and the City of New York over the trucking of spent nuclear fuel through the City. In an earlier phase, DOT persuaded the Second Circuit that the City's showing that barging was a safer alternative than trucking was not an appro-

priate attack on DOT's truck routing regulation, but rather would be considered by DOT in connection with the City's non-preemption application.[1] In denying the City's non-preemption application, the Department now takes the position that unless the City makes a threshold showing of exceptional or emergency circumstances, the Department will never consider the relative safety of barging as compared with trucking for the transportation of spent nuclear fuel.

This action arises from the parties' conflicting interpretations of section 112(b) of the Hazardous Materials Transportation Act, 49 U.S.C.App. § 1811(b). The City of New York brought this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201–02, and 5 U.S.C. §§ 701–06 against DOT and the Research and Special Programs Administration of DOT for review of a ruling by the Secretary of Transportation ("the Secretary") denying the City's application under section 112(b). Plaintiff and defendants have moved for summary judgment pursuant to that statute, as has defendant-intervenor the State of Connecticut. Defendants-intervenors Arkansas Power & Light Company, et al., have moved for judgment on the pleadings. The parties agree that there is no genuine issue as to any material fact, and therefore summary judgment is appropriate. For the reasons discussed below, the City's motion is granted and the case is remanded for further proceedings. Accordingly, defendants' motion and defendants-intervenors' motions are denied.

## GENERAL BACKGROUND

The Hazardous Materials Transportation Act, 49 U.S.C.App. §§ 1801–1812 ("HMTA"), was enacted in 1975 to "improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." HMTA § 102, 49

---

**1.** For a more detailed discussion of the earlier phases of this controversy, see *City of New York v. United States Department of Transportation,* 715 F.2d 732 (2d Cir.1983), *appeal dismissed* and *cert. denied,* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984).

U.S.C.App. § 1801. Among its provisions, the Act authorizes the Secretary to issue regulations establishing routing rules for the safe transportation of hazardous materials. HMTA § 105(a), 49 U.S.C.App. § 1804(a). HMTA also provides that any state or local requirement inconsistent with such regulations or any other regulation promulgated pursuant to the Act is preempted. HMTA § 112(a), 49 U.S.C.App. § 1811(a).

In 1976, New York City amended its health code to prohibit the transportation of spent nuclear fuel and other large quantities of radioactive material through the City without a Certificate of Emergency Transport from the Commissioner of Health.[2] The amendment effectively bans the use of motor vehicles for the carriage of spent fuel from nuclear reactors operating on Long Island because all roads from Long Island pass through the City.

The Government promptly challenged the validity under HMTA of the City's amendment. *United States v. City of New York*, 76 Civ. 273 (IBW) (S.D.N.Y. Jan. 15, 1976). The Government's motion for a preliminary injunction was denied, and the case was transferred to the suspense docket by stipulation. Thereafter, Associated Universities, Inc. ("Brookhaven"), which operates Brookhaven National Laboratories on Long Island, petitioned DOT to declare the City's requirement preempted by section 112(a) of HMTA. DOT ruled that HMTA did not preempt the City's amendment. 43 Fed. Reg. 16,954 (1978). DOT concluded that while section 105(a) of the Act authorizes the Secretary to promulgate rules governing the routing of hazardous materials, the Secretary had not yet exercised that au-

thority. The City was therefore free to enact its own routing rule.

In its ruling, DOT noted that if national routing rules were issued in the future, the City ordinance might become preempted unless the City received a non-preemption ruling from DOT, as permitted by section 112(b) of HMTA, 49 U.S.C.App. § 1811(b). DOT had published regulations prescribing the procedures for an application under section 112(b). 41 Fed.Reg. 38,167 (1976) (codified at 49 C.F.R. §§ 107.215–107.225).

Four months after its denial of Brookhaven's petition, the Department published an Advance Notice of Proposed Rulemaking concerning the "need, and possible methods for establishing routing requirements under the Hazardous Materials Transportation Act applicable to highway carriers of radioactive materials." 43 Fed.Reg. 36,492 (1978). DOT had become concerned that the increasing number of state and local laws which were adopted to regulate the transportation of radioactive materials were decreasing overall safety to the public and adversely affecting interstate commerce. After giving interested persons an opportunity to participate in the rulemaking proceedings, DOT published a proposed rule for the highway routing of radioactive materials. 45 Fed.Reg. 7140 (1980).

In commenting on the proposed rule, the City expressed its disappointment at DOT's failure to consider barging as an alternate means of transporting large quantities of radioactive material around urban centers which lack circumferential highways. The City accompanied its response to the proposed rule with a request that DOT issue a non-preemption determination pursuant to section 112(b) for section 175.111(1) of the City's Health Code. On July 31, 1980, DOT

---

**2.** The amendment to New York City Health Code § 175.111(1) reads in pertinent part:

(1) Notwithstanding the foregoing provisions of this section, a Certificate of Emergency Transport issued by the Commissioner or his designated representative shall be required for each shipment, to be transported through the City or brought into the City, of any of the following materials: ... (4) Spent reactor fuel elements or mixed fission products associated with such spent fuel elements the activity of which exceeds 20 curies ...

A "note" appended to the resolution adopting this subsection explains: "It is intended that such Certificate will be issued for the most compelling reasons involving urgent public policy or national security interests transcending public health and safety concerns and that economic consideration alone will not be acceptable as justification for the issuance of such Certificate."

Complaint of New York City, Ex. A.

denied the City's request as premature because no final rule had yet been promulgated with which the City's regulation could be deemed inconsistent.

DOT published its Final Rule on January 19, 1981. 46 Fed.Reg. 5298 (1981) (codified at 49 C.F.R. §§ 171–73, 177). Known as HM–164, the rule classifies various types of hazardous material, and specifies the highway routes to be used by carriers in transporting each type. For spent nuclear fuel which is classified as "highway route controlled quantity radioactive material," the rule provides in relevant part:

> Unless otherwise permitted by this section, a carrier and any person who operates a motor vehicle containing a package of highway route controlled quantity radioactive materials as defined in § 173.403(1) of this subchapter shall ensure that the vehicle operates over preferred routes selected to reduce time in transit, except that an Interstate System bypass or beltway around a city shall be used when available.
>
> (1) A preferred route consists of either or both:
>
> (i) An Interstate System highway for which an alternative route is not designated by a State routing agency as provided in this section, and
>
> (ii) A State-designated route selected by a State routing agency (see § 171.8 of this subchapter) in accordance with the DOT "Guidelines for Selecting Preferred Highway Routes for Highway Route Controlled Quantity Shipments of Radioactive Materials".

49 C.F.R. § 177.825(b) (1987).[3] It is undisputed that section 175.111(1)(4) of the City's Health Code is inconsistent with HM–164 since the City's provision bans the transportation of spent nuclear fuel through the City. *See* City's application

for a non-preemption determination (Dec. 24, 1984) (Ex. K at 2).[4]

By a letter of March 20, 1981, the City renewed its application for a non-preemption ruling. On January 15, 1982, DOT sent the City a letter indicating that the City's non-preemption application would probably not be approved for lack of substantial supporting documentation. Ex. B. The seven-page letter set out the analysis the City had to perform in order to present a proper request for a waiver. In the interim, the City had commenced an action in this district to invalidate HM–164. On February 19, 1982, the court held that HM–164 violated both HMTA and the National Environmental Policy Act ("NEPA"). In an amended opinion filed on May 6, 1982, the court invalidated HM–164 only insofar as it preempted the City's Health Code. *City of New York v. United States Department of Transportation*, 539 F.Supp. 1237 (S.D.N.Y.1982).

On August 10, 1983, the Second Circuit reversed the judgment of the district court, and remanded the case with instructions to enter a judgment upholding the validity of HM–164. *City of New York v. United States Department of Transportation*, 715 F.2d 732 (2d Cir.1983). The Second Circuit noted that the district court had focused on the effect of HM–164 on New York City, and that to the extent that its opinion was based on DOT's anticipated denial of the City's pending application for a non-preemption ruling under section 112(b), it was premature.

## HISTORY OF THIS ACTION

During the year following the Second Circuit's decision, the parties exchanged numerous letters concerning what steps the City was required to take to cure the deficiencies that DOT had noted in its preliminary responses to the City's earlier ap-

---

**3.** As originally adopted, 49 C.F.R. § 177.825(b) had established specific routing requirements for "large quantity radioactive materials." In a subsequent rulemaking action, the term "large quantity radioactive materials" was deleted and the term "highway route controlled quantity radioactive materials" was substituted. 48 Fed. Reg. 10,218 (1983). While there are some differences between the values for "large quantity" and "highway route controlled quantity" radioactive material, these differences do not materially affect the implementation of section 177.-825(b) and are not relevant to this action.

**4.** All references to lettered exhibits are to the exhibits attached to the Complaint of the City of New York.

plications for a non-preemption determination. On December 24, 1984, the City again applied for a determination pursuant to section 112(b) of HMTA that its Health Code requirement is not preempted. Ex. K. Although section 175.111(1) of the City Health Code restricts the transportation of five categories of radioactive materials, the City limited its request for a waiver of preemption to the restriction on spent nuclear fuel as set out in subdivision (4). *Id.* at 9.

On September 9, 1985, the Director of the Office of Hazardous Materials Transportation of DOT issued a ruling denying the City's application. Ex. Q. The introduction to a lengthy discussion labelled "Supplementary Information" stated: "This is the first time that the Department has issued a non-preemption determination ... The following discussion of general authority, therefore, represents not only the basis for this determination, but also the policy which will apply in future non-preemption determinations." *Id.* at 2.

In its application to DOT, the City argued that its local requirement should be allowed to stand despite its inconsistency with HM–164 because the City had demonstrated that alternate routes were available which offer a greater level of public safety than HM–164 without unreasonably burdening commerce. In particular, the City submitted a study prepared by Arthur D. Little, Inc. which concluded that there are three shipping alternatives to the use of interstate highways through the City that satisfy the two statutory criteria: (1) a chartered ferry from Orient Point, Long Island, to New London, Connecticut; (2) a chartered ferry from Port Jefferson, Long Island, to Bridgeport, Connecticut; and (3) a barge from Shoreham, Long Island, to Bridgeport, Connecticut. Ex. X. According to the City, since its showing met the only two requirements imposed by section 112(b), it was entitled to a waiver of preemption.

DOT never reached these questions of comparative safety and commercial burden. Instead, it held that an applicant for a waiver must first prove the existence of exceptional circumstances which necessitate immediate action to secure regulations more stringent than HM–164. To satisfy this threshold showing of exceptional circumstances, DOT concluded that an applicant must "present an objective demonstration that a Federal regulation, which provides an adequate level of safety on a nationwide basis, fails to provide an adequate level of safety in a given locale because of physical conditions which are unique to that locale." Ex. Q at 7. In this case, DOT required the City to demonstrate that although the procedures established in HM–164 for the highway transportation of spent nuclear fuel provide an adequate level of safety on a nationwide basis, they fail to provide an adequate level of safety in New York City because of physical conditions which are unique to the City.

The City's application cited two factors to demonstrate the City's uniqueness. DOT treated this portion of the application as a proffer of exceptional circumstances. The relevant part of the application read:

> The City of New York is unique in that not only is it the most densely populated area in the nation ... but it is also the only major population center in the United States without an Interstate system bypass or beltway for shipments emanating from a location generating large quantity radioactive materials—*i.e.*, there is no highway route around the City for shipments emanating from Long Island.

Ex. K at 4. DOT considered these two elements of the City's claim of uniqueness, and concluded that neither alone nor in their combined effect do they constitute exceptional circumstances. Therefore, DOT saw "no need to consider whether the City has satisfactorily addressed the statutory criteria governing [the] remedy [of non-preemption]." Ex. Q at 29.

The City filed an administrative appeal from this initial determination. The principal ground on appeal was that DOT had erred in requiring a threshold showing of exceptional circumstances before it would address the only two criteria specified in section 112(b) of HMTA. On December 23, 1986, the Administrator of the Research

and Special Programs Administration of DOT, affirmed the decision. Ex. V. In doing so, the Administrator found that the threshold showing was "wholly consistent" with the language of section 112(b) and "effectuates the Congressional intent as evidenced by the statutory aims and the legislative history." *Id.* at 4–5.

The Administrator also concluded that the procedure followed by DOT in announcing that a threshold showing of exceptional circumstances must be satisfied was proper. Since the threshold showing "goes to substance, not procedure," the Administrator determined that DOT did not have to include it in its publication of procedural regulations, and that it was appropriate to announce the requirement in this proceeding. *Id.* at 7. The Administrator went on to note that even if DOT should have published this criterion previously, its failure to do so did not prejudice the City since: (1) Congress, not DOT, established the prerequisite showing of exceptional circumstances; (2) the City was made aware of DOT's interpretation in correspondence between the two parties in 1982; and (3) the City remains free to resubmit an application for a non-preemption determination should exceptional circumstances arise. *Id.* at 8.

Having fully exhausted its administrative remedies, the City brought this action seeking judicial review of the Secretary's decision.

### THE ISSUES

In order to decide these motions, I must first determine whether in enacting HMTA, Congress specifically intended that an applicant for a non-preemption determination should be required to make a threshold showing of exceptional circumstances. If the answer to that question is no, I must consider whether in enacting HMTA, Congress delegated to DOT the power to impose such a requirement.

### DISCUSSION

I. *Does Section 112(b) Mandate a Threshold?*

A. The Statutory Language

Because the best evidence of the intention of Congress is the language Congress enacts, "the 'starting point in every case involving construction of a statute is the language itself.' " *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 357, 93 L.Ed.2d 216 (1986) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)); *see also United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986). Section 112(b) of HMTA provides:

> Any requirement, of a State or political subdivision thereof, which is not consistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is not preempted if, upon the application of an appropriate State agency, the Secretary determines, in accordance with procedures to be prescribed by regulation, that such requirement (1) affords an equal or greater level of protection to the public than is afforded by the requirements of this chapter or of regulations issued under this chapter and (2) does not unreasonably burden commerce. Such requirement shall not be preempted to the extent specified in such determination by the Secretary for so long as such State or political subdivision thereof continues to administer and enforce effectively such requirement.

In terms, the statute provides that a local jurisdiction's law is not preempted if the Secretary determines that the local law (1) affords an equal or greater level of protection to the public than is afforded by the requirements of HMTA or of regulations issued under the Act and (2) does not unreasonably burden commerce. There is no reference in the language of the statute to a threshold inquiry. Only two criteria are specified. Thus, the words of the statute answer the question of whether Congress intended to require a threshold showing of exceptional circumstances before the two statutory criteria would even be considered. *See Bethesda Hospital Association v. Bowen,* —— U.S. ——, 108 S.Ct. 1255, 1258, 99 L.Ed.2d 460 (1988) ("The plain meaning of the statute

decides the issue presented"); *Burlington Northern Railroad Company v. Oklahoma Tax Commission,* 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) ("Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.'" (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981))).

DOT argues that as the agency charged with administering the statute, its construction is entitled to considerable deference. This argument is sound as a general principle of law. But the language of section 112(b) is not susceptible of the interpretation that DOT advances, and an "[agency's] 'interpretation' of [a] statute cannot supersede the language chosen by Congress." *Mahasco Corp. v. Silver,* 447 U.S. 807, 825, 100 S.Ct. 2486, 2497, 65 L.Ed. 2d 532 (1980). In *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986), the Supreme Court upheld this approach:

> If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843 [104 S.Ct. 2778, 2781, 81 L.Ed.2d 694] (1984). The traditional deference courts pay to agency interpretation is not applied to alter the clearly expressed intent of Congress.

*Id.* at 368, 106 S.Ct. at 686; *accord Independent Insurance Agents of America, Inc. v. Board of Governors of the Federal Reserve System,* 838 F.2d 627, 632 (2d Cir. 1988).

Deference to DOT's present construction of section 112(b) is less appropriate in this case because it is contrary to DOT's interpretation of the statute at the time of its enactment. An agency's contemporaneous construction of a statute is accorded great deference. *See, e.g., Watt v. Alaska,* 451 U.S. 259, 272–73, 101 S.Ct. 1673, 1680–81, 68 L.Ed.2d 80 (1981); *Equal Employment Opportunity Commission v. Associated Dry Goods Corp.,* 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981); *St. Regis Mohawk Tribe, New York v. Brock,* 769 F.2d 37, 51 (2d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). On September 9, 1976, less than two years after HMTA was enacted, DOT amended 49 C.F.R. Part 107 to "establish procedural regulations that implement the preemption provisions of section 112 of [HMTA]." 41 Fed.Reg. 38,167 (1976). In the course of setting out the procedures that an applicant for a non-preemption determination must follow, DOT described the substantive showings as well. The regulations provide that an applicant must address why it believes that its requirement affords an equal or greater level of protection to the public than is afforded by the requirements of the Act or the regulations issued under the Act, and why the applicant believes that its requirement does not unreasonably burden commerce. 49 C.F.R. § 107.215(b)(6), (7) (1987). The regulations do not mention a threshold showing or that an applicant must demonstrate exceptional circumstances.

■ DOT's present interpretation is also contrary to the construction of section 112(b) that DOT has followed since these regulations were promulgated. An agency's consistent and long-standing interpretation of a statute it administers is entitled to considerable weight. *United States v. Clark,* 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982); *Equal Employment Opportunity Commission,* 449 U.S. at 600 n. 17, 101 S.Ct. at 823 n. 17; *United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975). But "[a]n agency['s] interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Immigration and Naturalization Service v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (quoting *Watt,* 451 U.S. at 273, 101 S.Ct. at 1681). DOT has not previously announced that section 112(b) requires a threshold showing

of exceptional circumstances. On the contrary, when asked by the City what must be demonstrated in order to obtain a non-preemption determination, DOT has consistently cited the two requirements enumerated in the statute.

For example, in a letter dated both June 26, 1984, and July 6, 1984, the Secretary responded to the City's request for a temporary waiver of the preemptive effect of HM–164 on section 175.111(1) of the City's Health Code. Ex. F. In denying the request, the Secretary noted that "until the City demonstrates that barging provides at least an equivalent level of safety and that its requirement does not unreasonably burden commerce, the Department will have no justification for waiving the preemptive effect of HM–164." Id. at 2. The Secretary did not suggest that a threshold in-. quiry would be undertaken before these two criteria would be considered.

When the City submitted its formal application on December 24, 1984, DOT published notice of the City's application, and invited public comment. 50 Fed.Reg. 2528 (1985). The public notice stated that an applicant is required to demonstrate that its inconsistent requirement satisfies the two criteria mentioned in section 112(b), and the "Public Comment" provision indicated that comments should be limited to the following issues:

(a) Whether the City's restriction on the highway transportation of spent nuclear fuel affords the public an equal or greater level of protection than is afforded by HM–164. [N.B. the "public" includes all who are or would be exposed to transportation risk, not just those who are or would be affected in New York City.]
(b) Whether the City's restriction on the highway transportation of spent nuclear fuel unreasonably burdens commerce.

Id. at 2528, 2530. In this public announcement, DOT made no reference to a threshold requirement that the City demonstrate exceptional circumstances. See also Letter from M. Cynthia Douglass, Administrator, Research and Special Programs Administration (Dec. 17, 1984) (Ex. J at 3) ("The alternative(s) that the City proposes must

satisfy the criteria stated in Section 112(b) of the Hazardous Materials Transportation Act (HMTA) of 1974, which pertain to the affording of 'an equal or greater level of protection to the public' and not 'unreasonably burden(ing) commerce.'"); Brief for the Department of Transportation as Amicus Curiae in New Hampshire Motor Transport Association v. Flynn, 751 F.2d 43 (1st Cir.1984) at 5 n. 3 ("After consideration of the comments, a decision to grant an exemption is made based on the statutory criteria—i.e., whether the local regulation affords equal or greater protection than the federal regulation and whether the local regulation does not unreasonably burden interstate commerce.").

DOT's earlier and different interpretation of section 112(b) was advanced in the brief DOT filed with the Second Circuit in City of New York, 715 F.2d at 732. In that case, the District Court had held that by giving insufficient attention to barging as an alternative to HM–164 for the City, DOT had violated NEPA. In appealing this decision, DOT submitted a reply brief to the Second Circuit in which it argued:

First, the City and State have failed to demonstrate that DOT's decision to leave consideration of site-specific alternatives to the nonpreemption determination stage was unreasonable. Whether barging (the only alternative the State and City point to) is an appropriate alternative to highway transport in the New York City area is a matter that will be considered in a proper nonpreemption hearing. It was not an alternative the agency needed to analyze in preparing a nationwide highway rule.

Reply Brief for Appellants the United States Department of Transportation and the Materials Transportation Bureau at 18–19.

The Second Circuit held that DOT did not violate NEPA by omitting from its Environmental Assessment consideration of barging as an alternative to HM–164 for the City. City of New York, at 741–45. In reaching its decision, the Court reasoned that "the opportunity for a non-preemption ruling will enable the Department to give

adequate consideration to the barging alternative in those areas where local circumstances might warrant it," and is

> a complete answer to the claim that DOT was required in its Environmental Assessment to consider the barging alternative specifically for New York City. When an agency undertakes a national regulatory scheme like HM–164 and adopts procedures permitting localized environmental alternatives to be considered at a later date, we will not fault the agency for not considering these particular alternatives in its original Environmental Assessment.

*Id.* at 744. Under DOT's current construction of section 112(b), the barging alternative is not to be considered at the non-preemption determination stage, contrary to DOT's previous representation to the Second Circuit.

DOT points to a letter of January 15, 1982, from Alan I. Roberts, Associate Director of the Office of Hazardous Materials Transportation, to the City as evidence that DOT has previously interpreted section 112(b) to require a threshold showing of exceptional circumstances. Ex. B. The bulk of Mr. Roberts letter focused on what the City must do to comply with the two statutory criteria. *Id.* at 3–5. While Mr. Roberts referred to "peculiar circumstances" and "exceptional circumstances," he did not elaborate on the significance of these terms. He also did not state that the City would be required to demonstrate that peculiar or exceptional circumstances exist before DOT would even consider the two statutory criteria. Even if I were to assume that this letter represents an unambiguous expression by DOT of the same interpretation of section 112(b) as it now advances, it cannot be argued that the letter establishes a long-standing interpretation of section 112(b). HMTA was enacted in 1975. On all other occasions between 1975 and its decision in this case, DOT's construction of section 112(b) has followed the plain meaning of the statutory language, contrary to the interpretation now advanced.

The fact that DOT's present interpretation of section 112(b) differs from its past position does not mean that its present interpretation is not entitled to any weight. An administrative agency "is not disqualified from changing its mind." *Ewing v. NLRB,* 861 F.2d 353, 357 (2d Cir.1988). But when an agency's interpretation marks a clear change of course, it must be examined closely. *See, e.g., New York Council, Association of Civilian Technicians v. Federal Labor Relations Authority,* 757 F.2d 502, 509 (2d Cir.), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985); *Office of Communication of the United Church of Christ v. Federal Communications Commission,* 560 F.2d 529, 532 (2d Cir.1977). DOT's changed interpretation is not supported by the plain words of section 112(b), and therefore cannot withstand such an examination.

**B. Legislative History of Section 112(b)**

■ When the language of a statute is clear, its legislative history is examined only to ascertain whether there is a clearly expressed intention contrary to the statutory language. *See, e.g., Cardoza–Fonseca,* 480 U.S. at 432 n. 12, 107 S.Ct. at 1213 n. 12; *Rodriguez v. Compass Shipping Co.,* 451 U.S. 596, 604, 101 S.Ct. 1945, 1951, 68 L.Ed.2d 472 (1981); *Shea v. County of Rockland,* 810 F.2d 27, 28 (2d Cir.1987). While there is considerable legislative material concerning the passage of HMTA, very little of it focuses on the preemption provisions. Reference is made to section 112(b) of the Act in only two places: (1) the report submitted by the committee of conference to the House and Senate (Senate Conference Report, S.Rep. No. 1347, 93d Cong., 2d Sess. (1974) U.S.Code Cong. & Admin.News 1974, pp. 7669, 7683; House Conference Report, H.R.Rep. No. 1589, 93d Cong., 2d Sess. (1974)) ("Conference Report"); and (2) the report of the Senate Committee on Commerce (S.Rep. No. 1192, 93d Cong., 2d Sess. (1974)) ("Senate Report"). The discussions contained in these sources do not reveal a clearly expressed legislative intention contrary to the language of section 112(b).

The Conference Committee was formed to iron out the differences between the House bill, H.R. 15223, and the counterpart bill in the Senate, S. 4057. When H.R. 15223 was reported out of the House, it did not contain a provision concerning the effect that HMTA and regulations promulgated pursuant to it would have on inconsistent non-federal laws. The Senate bill contained a preemption provision, which became section 112(a). Along with a provision for preemption of state and local laws, the Senate adopted a non-preemption provision, which became section 112(b). Senate Report at 63.

■ After pointing out that the House bill did not contain any provision for preemption, the Conference Report described the Senate bill as follows:

The Senate amendment further provided for the preemption of any requirement of a State or political subdivision which is inconsistent with any requirement of, or regulation under, this legislation, except that such State or political subdivision may seek to apply its own statute or regulation where they afford an equal or greater level of protection and they do not burden interstate commerce.

Conference Report at 25. In resolving the difference between the House bill and the Senate bill, the Conference Committee decided to "adopt[ ] the Senate provision on preemption." *Id.* There is no discussion in the Conference Report of the reasons underlying this decision, nor is there any discussion of how the Conference Committee interpreted the provision's language. The Conference Committee's intention is found only in its description of the Senate amendment in which the Conference Committee made no mention of a threshold requirement of exceptional circumstances. A conference report is the most persuasive evidence of congressional intent next to the statute itself. *Railway Labor Executives' Association v. Interstate Commerce Commission,* 735 F.2d 691, 701 (2d Cir.1984).

■ DOT points to two sentences in the Senate Report as evidencing a legislative intention to require an initial showing of exceptional circumstances. The preemp-

tion provision was discussed in two sections of the Senate Report. In the "Description" section, the Report stated: "The title would also preempt State regulation in this area unless the State standards provide a level of protection equal to or greater than the Federal Regulations as determined by the Secretary." Senate Report at 3. In the "Section–By–Section Analysis," the Report described the preemption provision as follows:

This section sets out the general guidelines for how this bill, and regulations promulgated under it, are to interact with certain other Federal laws and with the laws of States and other political subdivisions. The Committee endorses the principle of Federal preemption in order to preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials transportation. However, the Committee is aware that certain exceptional circumstances may necessitate immediate action to secure more stringent regulations. For the purpose of meeting such emergency situations, the Committee has provided that any State or political subdivision may request, and the Secretary may grant, approval of regulations which vary from Federal regulations, provided that they are equivalent or more stringent and place no burden on interstate commerce.

Subsection (a) sets out the general rule that conflicting laws of States and other political subdivisions are preempted.

Subsection (b) sets up the mechanism by which a State or other political subdivision can apply to avoid preemption upon a showing that the regulation in question provides protection that is equal to or better than that provided by the Federal regulation.

Senate Report at 37–38.

Neither the summary of the provision in the "Description" section nor the discussion of the provision in the third paragraph of the "Section–By–Section Analysis" makes reference to a threshold requirement of exceptional circumstances. DOT

relies solely on the third and fourth sentences of the first paragraph of the "Section–By–Section Analysis" to support its contention. The meaning of these sentences is ambiguous. Nowhere in the Senate Report is there any discussion of the content of "exceptional circumstances" or "emergency situations." Nor is there any explanation of the absence of these words from the text of the statute.

Two ambiguous sentences in the Senate Report do not support the heavy weight placed on them by DOT to vary the plain language of the statute. DOT's attempt to enforce these sentences as if they were part of the statutory text, and to ignore the plain language of section 112(b), is not persuasive. *See, e.g., United States v. American College of Physicians,* 475 U.S. 834, 846, 106 S.Ct. 1591, 1598, 89 L.Ed.2d 841 (1986) (court declined to adopt rule that House reports seemingly endorsed because the rule had no statutory reference point); *International Brotherhood of Electrical Works, Local Union No. 474, AFL–CIO v. National Labor Relations Board,* 814 F.2d 697, 712 (D.C.Cir.1987) ("We believe that a cardinal principle of the judicial function of statutory interpretation is that courts have no authority to *enforce* principles gleaned *solely* from legislative history that has no statutory reference point." (emphasis in original)); *United States v. Lincoln Rochester Trust Co.,* 297 F.2d 891, 893 (2d Cir.) (portion of House report referring to language not included in Act as finally adopted may not be relied on in interpreting Act), *cert. denied,* 369 U.S. 887, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962).

## II. *DOT's Discretion Under Section 112(b)*

DOT also argues that section 112(b) of HMTA grants the Secretary discretion to establish a threshold requirement of exceptional circumstances. To support its position, DOT points to the phrase in the Senate Report that "the Secretary may grant, approval of regulations which vary from Federal regulations, provided that they are equivalent or more stringent and place no burden on interstate commerce." Senate Report at 38. DOT believes that use of the

word "may" signifies that the Secretary has discretion to deny a locality's non-preemption application even if the locality satisfies the two statutory criteria. DOT argues that this discretion also supports the Secretary's imposition of an exceptional circumstances requirement.

DOT cannot reasonably rely on the Senate Report to change the words of section 112(b). While the statutory language confers some discretion upon the Secretary, it does not empower her to adopt a threshold requirement of exceptional circumstances. The statute provides that an inconsistent requirement of a State or political subdivision "is not preempted if . . . the Secretary determines, in accordance with procedures to be prescribed by regulation, that such requirement" complies with two enumerated standards. This language supports two sources of discretion, but neither is sufficient to authorize the Secretary to establish the threshold requirement of exceptional circumstances.

First, the phrase "in accordance with procedures to be prescribed by regulation" vests the Secretary with the authority to promulgate regulations prescribing procedures to implement this section. As DOT has acknowledged, however, the threshold requirement of exceptional circumstances is substantive, and not procedural. Therefore, this source does not provide support for DOT's position. *See* Decision of the Administrator, Research and Special Programs Administration (Dec. 23, 1986) (Ex. V at 7) ("the threshold showing goes to substance, not procedure"). Second, the phrase "if . . . the Secretary determines" allows the Secretary to exercise discretion in determining the nature of the showing that a locality must make in order to satisfy the two statutory standards. The exceptional circumstances requirement is a separate and independent standard, and not simply a factor to be considered in determining whether the two statutory standards have been met. Thus, this source of discretion also does not empower the Secretary.

DOT points to the second sentence of section 112(b) to support its contention.

DOT argues that "[t]he language of the second sentence is plainly discretionary," and that "[f]or the two sentences to be consistent, the phrase 'if ... the Secretary determines' in the first sentence must be read as discretionary as well." Federal Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 13–14. I have serious reservations concerning DOT's reading of the second sentence. It suffices to note that the phrase "if ... the Secretary determines" confers discretion upon the Secretary, but, for the reason discussed above, not to the extent necessary to establish the exceptional circumstances requirement.

The fact that section 112(b) limits the Secretary's discretion to regulations that establish procedural guidelines only does not signify that Congress did not intend the Secretary to issue substantive regulations to implement other provisions of HMTA. There are several sections of the Act in which Congress delegated broad authority to the Secretary to issue substantive regulations. *See, e.g.,* HMTA § 105(a), 49 U.S.C.App. § 1804(a) ("The Secretary may issue ... regulations for the safe transportation in commerce of hazardous materials."); HMTA § 106(a), 49 U.S.C.App. § 1805(a) ("The Secretary is authorized to establish criteria for handling hazardous materials."). A comparison of the various sections of the Act demonstrates that Congress delegated different levels of discretion to the Secretary in regulating the various aspects of hazardous materials transportation. Section 112(b) concerns one such aspect—the determination that local laws which are inconsistent with regulations under HMTA are not preempted. In section 112(b), Congress delegated only the power to establish regulations prescribing procedures and to determine the showing that a locality must make in order to satisfy the two statutory standards.

## III. *DOT's Other Arguments*

While the language of section 112(b) of HMTA requires the result I reach, my conclusion is also supported by the purpose and structure of the Act.

DOT argues that in enacting HMTA, Congress was concerned with ensuring only that an adequate level of safety would be provided to the public in the transportation of hazardous materials. However, there is no basis in either the statute or its legislative history to suggest that Congress intended that a mode of transportation which would maximize safety in a jurisdiction should be rejected in favor of a method that provides only an adequate level of safety for the public in that jurisdiction even if the safer mode does not unreasonably burden interstate commerce. To support its position that Congress intended to establish only an adequate level of safety for the transportation of hazardous materials, DOT points to the Second Circuit opinion in *City of New York,* 715 F.2d at 732. While the Second Circuit found that Congress did not require that DOT's routing rules maximize safety on a jurisdiction-by-jurisdiction basis, the Court read the non-preemption procedure of section 112(b) as the method selected by Congress to increase local safety above the nationally adequate standard. *Id.* at 740.

Finally, DOT contends that if the express language of section 112(b) were followed, uniformity would be destroyed and localities would be encouraged to race to export risks of hazardous materials transportation to their neighbors. This argument is not persuasive. To prevent the export of risks, DOT can and does require as part of the statutory showing of equal or greater safety that an applicant for non-preemption show the effect of its requirement on the surrounding states and localities. DOT has taken the position that in order to meet this statutory standard, an applicant must:

> present an objective analysis of the safety impacts on all jurisdictions that would be affected by the inconsistent rule, not merely the safety impacts on the enacting jurisdiction. The Department has consistently relied on case law in holding that a state or local government may not resolve a safety problem by effectively exporting it to another jurisdiction.

Decision of the Director, Office of Hazardous Materials Transportation (Sept. 9, 1985) (Ex. Q at 8). *See also* Notice, 50 Fed.Reg. 2528, 2530 (1985) ("N.B. the 'public' includes all who are or would be exposed to transportation risk, not just those who are

or would be affected in New York City."). Moreover, the absence of a required threshold showing of exceptional circumstances has not led to a multiplicity of state and local regulations. In fact, during the thirteen years since the enactment of HMTA, only the City of New York and the Town of Farmingham, Massachusetts, have applied for waiver of preemption.[5]

CONCLUSION

HMTA does not authorize the Secretary to require that an applicant for a non-preemption determination make a threshold showing of exceptional circumstances. Therefore, that requirement was improperly imposed on the City of New York. Accordingly, the Secretary's denial of the City's application for non-preemption is reversed, and the City's application is remanded with instructions that the Secretary determine whether the application complies with the two statutory criteria.[6]

SO ORDERED.

---

**5.** On June 30, 1980, the Commonwealth of Massachusetts applied for a waiver of preemption for certain provisions of the Town of Farmingham's by-law governing the transportation and storage of vinyl chloride. 49 Fed.Reg. 3166 (1984). However, DOT treated the request as one for a determination of inconsistency, and no action was taken on the application for a non-preemption determination. *Id.* at 3167. I have not been informed of any other applications.

**6.** There is no need for me to reach the propriety of the procedure followed by DOT in announcing its construction of HMTA, and therefore I do not do so. In addition, it is not necessary to address the City's argument that it did not first have to avail itself of the preferred route selection procedure established in HM–164 before it sought a non-preemption determination because DOT concedes this point.