**Robert T. EWING, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Herbert F. Darling, Inc., Intervenor.**

**No. 15, Docket 88–4053.**

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1988.

Decided Nov. 4, 1988.

Michael H. Ranzenhofer, Buffalo, N.Y.
(Mattar, D'Agostino, Kogler & Runfola,
Buffalo, N.Y., of counsel), for petitioner.

Barbara A. Atkin, Supervising Atty.,
N.L.R.B., Washington, D.C. (Rosemary M.
Collyer, Gen. Counsel, John E. Higgins, Jr.,

Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent.

Daniel P. Forsyth, Buffalo, N.Y. (Flaherty, Cohen, Grande, Randazzo & Doren, P.C., Buffalo, N.Y., of counsel), submitted a brief for intervenor.

Before KAUFMAN and MAHONEY, Circuit Judges, and McAVOY, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

This case is before us for the third time in four years. In *Ewing v. NLRB*, 732 F.2d 1117 (2d Cir.1984) (*"Ewing I"*), we reversed the National Labor Relations Board's ("NLRB" or "Board") finding that Herbert R. Darling, Inc. ("Darling") did not discriminate against Robert Ewing when it refused to rehire him in the mistaken belief that he had filed a complaint with the Occupational Safety and Health Administration ("OSHA"). We remanded for the Board to determine whether its intervening change of the controlling legal standard in *Meyers Industries, Inc.*, 268 N.L.R.B. 493 (1984) (*"Meyers I"*), applied and should govern retroactively. *Meyers I* replaced the presumption that individual action for "mutual aid or protection" was "concerted" within the meaning of § 7 of the National Labor Relations Act ("NLRA" or the "Act") with an objective test requiring some linkage to group action before finding an act "concerted." On remand, the Board applied the *Meyers* rule and dismissed Ewing's complaint, finding a single employee's assertion of a statutory employment right too remotely related to collective acts to constitute "concerted activit[y]."

In 1985, Ewing appealed and we had our first opportunity to review the *Meyers* approach. We held that the Board adopted its new interpretation in the erroneous belief that the NLRA should be construed literally. *Ewing v. NLRB*, 768 F.2d 51, 54

(2d Cir.1985) (*"Ewing II"*). Due to the absence of a definitive agency decision, we declined to rule on the legality of the *Meyers* standard and remanded to the Board for reconsideration. *Id.* at 56. We suggested that it would be reasonable to hold that individual invocation of a statutory right was sufficiently related to group action to warrant protection under § 7. *Id.* at 55, 56.

The Board rejected our approach and justified its interpretation as a reasonable construction of the Act. On this third petition, we have carefully reviewed the *Meyers* rule and the Board's revised rationale. The Board's conclusion that a single employee's invocation of a statutory employment right is not "concerted activit[y]" under § 7 is not, in our view, preferable. Nevertheless, we reluctantly conclude that the Board has offered a reasonable interpretation of the Act.

## I.

Since *Ewing I* details the now undisputed facts, we offer only a brief summary. Petitioner Robert T. Ewing, a member of the Piledrivers, Dock Builders, Trestle, Crib and Breakwater Builders, Local 1978, AFL–CIO (the "Union"), operated a piledriver at Darling's mass transit construction project in Buffalo, NY. Unprompted by any complaint, OSHA officials visited the jobsite in October 1980 for a routine inspection. On December 3, 1980, Darling laid off Ewing and four of his co-workers. Although the other employees were rehired by December 19, 1980, Darling did not reemploy Ewing because it suspected he was one of three individuals who might have filed a complaint with OSHA. In testimony credited by the Administrative Law Judge ("ALJ"), the Union Business Manager told Ewing that, according to the grapevine, "he blew the Darling Company into OSHA, and as a result, wasn't going to be put back to work." After learning from OSHA that Ewing had not filed a com-

* The Honorable Thomas J. McAvoy, United States District Judge for the Northern District of New York, sitting by designation.

plaint, Darling rehired Ewing on April 27, 1981. During the next 4 months, Ewing worked approximately 30 days. He was laid off and rehired three times.

Ewing filed an unfair labor practice charge on July 21, 1981. After a two day hearing, the ALJ found that Darling had violated § 8(a)(1) of the Act by interfering with Ewing's § 7 right to engage in "concerted activit[y]" ... for "mutual aid or protection."[1] The ALJ's opinion correctly stated that *Alleluia Cushion Co.,* 221 N.L.R.B. 999 (1975), governed the case. *Alleluia* established the presumption that individual invocation of a statutory employment right constituted "concerted activit[y]" under § 7. The assertion of such a collective concern, the Board held, received the implied consent of all, absent evidence that co-workers disavowed the act.

The Board's decision in *Herbert F. Darling, Inc.,* 267 N.L.R.B. 476 (1983) ("*Darling I*"), rejected credibility determinations the ALJ made after observing the demeanor of witnesses, reversed the ALJ's findings, and dismissed the complaint. By focusing on the facts, the Board did not reach the applicable legal standard. Ewing petitioned for review and we reversed, finding the Board's actions unsupported by substantial evidence. *Ewing I,* 732 F.2d at 1121–22.

We remanded because, in its intervening *Meyers I* decision, the Board overruled the *Alleluia* presumption and instituted a rule requiring a demonstrable link with group action before an individual act could be deemed "concerted." Under the new approach, such activity is "concerted" only if "engaged in with or on the authority of other employees." *Meyers I,* 268 N.L.R.B. at 497. *Meyers I* dealt with an employer's discharge of Kenneth Prill for filing a safety complaint with a state agency regarding the defective brakes on the company truck he was driving. The Board held that Prill's invocation of his statutory right lacked suf-

ficient connection with collective employee action to warrant § 7 protection. *Id.* at 497–99.

On remand from *Ewing I,* the Board, in *Herbert F. Darling, Inc.,* 273 N.L.R.B. 346 (1984) ("*Darling II*"), applied *Meyers I* retroactively pursuant to its "traditional approach" of deciding pending cases with its current standard. *Id.* at 346–47. Over a dissent, the Board followed *Meyers.* It dismissed Ewing's complaint after finding his alleged action was not "concerted" because it lacked the requisite link to group activity. *Id.*

Ewing again petitioned us for review. We reversed and remanded "for reconsideration [of the new standard] because of the Board's mistaken view that it was required to interpret 'concerted activities' literally...." *Ewing II,* 768 F.2d at 54. *Accord Prill v. NLRB,* 755 F.2d 941 (D.C.Cir.) ("*Prill I*"), *cert. denied,* 474 U.S. 948, 971, 106 S.Ct. 313, 352, 88 L.Ed.2d 294, 320 (1985). We noted that while *Meyers I* responded to circuit criticism of *Alleluia,* " 'many of the cases that rejected *Alleluia* relied on reasoning or on earlier decisions that disapproved all forms of "constructive concerted activity" ... [and many] did not involve occupational safety or other statutory rights, but rather involved individual employee protests about job conditions.' " *Ewing II,* 768 F.2d at 55 (quoting *Prill v. NLRB,* 755 F.2d at 953 n. 72). After observing that *Alleluia* expressed a reasonable presumption, we refrained from passing on the *Meyers* standard because the Board's approach stemmed from an erroneous premise. We instructed the NLRB to articulate "a sustainable basis for its definition of 'concerted activities' ... or to reinstate the [ALJ's] decision...." *Ewing II,* 768 F.2d at 56. In particular, the Board was required to offer " 'a reasoned explanation of why the new rule effectuates the statute as well as or better than the old rule.' " *Id.* (quoting *New York Council,*

---

**1.** Section 8(a)(1) states: "It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of [§ 7] rights...." 29 U.S.C. § 158(a)(1) (1982). Section 7 provides, in relevant part, "Employees shall have the right to self-organiza-

tion, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." *Id.* § 157.

*Ass'n of Civilian Technicians v. FLRA,* 757 F.2d 502, 508 (2d Cir.1985)).

In another of the seemingly endless stream of intervening decisions affecting this case, the Board filed *Meyers Industries, Inc.* 281 N.L.R.B. No. 118 (Sept. 30, 1986) (*"Meyers II"*), enf'd, *Prill v. NLRB,* 835 F.2d 1481 (D.C.Cir.1987) (*"Prill II"*), cert. denied, —— U.S. ——, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988), while considering our decision in *Ewing II.* On remand from the District of Columbia Circuit, *Meyers II* reconsidered and expanded the rationale of *Meyers I.* The NLRB also noted numerous instances where, under the *Meyers* rule, it would deem individual action "concerted." Subsequently, the Board rendered its second supplemental decision, *Herbert F. Darling, Inc.,* 287 N.L.R.B. No. 148 (Feb. 29, 1988) (*"Darling III"*), which reaffirmed the *Meyers' I* rule and its updated reasoning. Except for addressing *Meyers'* retroactive application to Ewing's case, *Darling III* merely reiterated the justifications offered in *Meyers II.* See id. at 10 (*"Meyers II* directly addresses the court's ... concerns."). In reviewing these findings, we are, of course, mindful that decisions based upon the Board's expertise should receive, pursuant to longstanding Supreme Court precedent, "considerable deference." *NLRB v. City Disposal Systems, Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984) (citing *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978); *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944)). Unless unreasonable or inconsistent with the Act, we may not replace the Board's determination with our own. See *American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). Nor is it relevant that the Board altered its doctrinal position. " 'An administrative agency is not disqualified from changing its mind; and when it does, the courts ... should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes.' " *Ewing II,* 768

F.2d at 56 (quoting *Iron Workers,* 434 U.S. at 351, 98 S.Ct. at 660–61). Nevertheless, the Supreme Court has admonished us "not 'to stand aside and rubber stamp' Board determinations that run contrary to the language or tenor of the Act." *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (quoting *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).

*Meyers II* afforded the Board an opportunity to reexamine its decision to reject the *Alleluia* presumption. Like *Darling II, Meyers I* was erroneously based on the theory that the Act compelled a literal interpretation of § 7. *Prill I,* 755 F.2d at 948–50. Rather than return to its old rule, the NLRB adhered to its view that individual acts require some demonstrable link with group action to be deemed "concerted." It offered the detailed justification of its position this court sought when we remanded in *Ewing II.* It is to this analysis that we now turn.

## II.

The Section 7 right to engage in "concerted activities for ... mutual aid or protection" did not emerge in a vacuum. Although the Supreme Court stated that "there is nothing in the legislative history of § 7 that specifically expresses the understanding of Congress in enacting the 'concerted activities' language," *City Disposal,* 465 U.S. at 834, 104 S.Ct. at 1511, its discussion of the legislative usage of the phrase reveals an awareness of Congress's efforts to even leverage in negotiations between employer and employee. *Id.* at 834–35, 104 S.Ct. at 1512–13.

Congress first used the word "concert" in §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52 (1982), which sought to nurture trade unionism by preventing employers from inhibiting collective action through criminal conspiracy and restraint of trade suits. The phrase "concerted activities" first appeared in the Norris–LaGuardia Act, 29 U.S.C. § 102 (1982), which narrowed the courts' ability to issue labor injunctions. This same language then re-

appears in § 7 of the NRLA, 29 U.S.C. § 157 (1982), § 7(a)(1) of the National Industrial Recovery Act of 1933, 48 Stat. 198 (1933), and § 2(a) of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401(a) (1982). *See generally City Disposal,* 465 U.S. at 834–35, 104 S.Ct. at 1512–13; *Eastex, Inc. v. NLRB,* 437 U.S. 556, 565 n. 14, 98 S.Ct. 2505, 2512 n. 14, 57 L.Ed.2d 428 (1978). As the Supreme Court stated, "Against the background, it is evident that, in enacting § 7 of the NLRA, Congress sought generally to equalize the bargaining power of the employee with that of his employer...." *City Disposal,* 465 U.S. at 835, 104 S.Ct. at 1513.

*Meyers II* presented a similar analysis of § 7, focusing on Congress's intent to foster "collective, as distinct from purely individual, activity." *Meyers II,* 281 N.L.R.B. No. 118, slip op. at 4. The NLRB then grounded its decision to require "some linkage" to group action before finding individual action "concerted" on this essential element of the Act. *Id.* at 6. The Supreme Court cited *Meyers I* with approval for expressing the proposition that "[t]he term 'concerted activit[y]' is not defined in the Act but clearly enough embraces the activities of employees who have joined together in order to achieve common goals." *City Disposal,* 465 U.S. at 830, 104 S.Ct. at 1511.

The Board asserted that *Meyers I* "proceeds logically" from the structure and purposes of the NLRA. Its gloss of the Act's legislative history and the Supreme Court's analysis revealed that "protection for joint employee action ... lies at the heart of the Act." *Meyers II,* 281 N.L.R.B. No. 118, slip op. at 6. Therefore, the Board concluded, requiring "some linkage to group action in order for conduct to be deemed 'concerted' within the meaning of Section 7," *id.,* is "most responsive to the central purposes for which the Act was created." *Id.* at 4.

The second leg of the Board's justification for replacing the *Alleluia* presumption with the *Meyers* rule is that the *Meyers II* analysis of § 7 is consistent with the Supreme Court's analysis of § 7 in *City Dis-*

*posal. Darling III,* 287 N.L.R.B. No. 148, slip op. at 11–12, 15. *City Disposal* concerned the discharge of an employee for invoking his collectively bargained right not to drive a truck he reasonably considered unsafe. The Supreme Court held that individual invocation of a collectively bargained right constitutes a "concerted activit[y]" under the Act.

The NLRB reasoned that its new rule followed *City Disposal* by giving "separate meanings to the 'mutual aid or protection' clause and the 'concerted activities' clause of Section 7." *Darling III,* 287 N.L.R.B. No. 148, slip op. at 11. Before addressing the question of concertedness, the Supreme Court noted that all parties agreed such an invocation met the "mutual aid or protection" requirement. *City Disposal,* 465 U.S. at 830, 104 S.Ct. at 1510. While not directly adopting separate standards, the Court's approach followed its decision in *Eastex, Inc. v. NLRB,* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978), which involved employees' distribution of a union newsletter.

*Eastex* did not question that the employees' action was "concerted." Rather, the dispute centered on whether circulation of the pamphlet related to "mutual aid or protection." We adopted this bifurcated analysis in *Ewing II,* where the conflict turned on whether Ewing's alleged act was "concerted" and all agreed that the "mutual aid or protection" clause encompassed " 'seek[ing] to improve working conditions through resort to administrative and judicial forums.' " *Ewing II,* 768 F.2d at 53 (quoting *Eastex,* 437 U.S. at 566, 98 S.Ct. at 2512).

The Board cited this mode of analysis as support for its critique of the *Alleluia* presumption, which collapsed the "concerted[ness]" and "mutual aid or protection" tests by deeming any act for "mutual aid or protection" "concerted." *See Meyers II,* 281 N.L.R.B. No. 118, slip op. at 10–11. In the Board's view, *Alleluia* "questioned whether the purpose of the activity was one it wished to protect and, if so, if [sic] then deemed the activity 'concerted,' without regard to its form." *Meyers I,* 268

N.L.R.B. at 495. The *Meyers* rule rejected this presumption, adopting in its stead an objective rule that examines an act's concertedness without regard for its purpose.

We agree with the District of Columbia Circuit's analysis that the NLRA "could be read to support either the *Alleluia* or *Meyers* interpretation of concerted activity...." *Prill II*, 835 F.2d at 1483. Therefore, we hold the *Meyers* rule to be a reasonable construction of the Act.

### III.

Having approved the Board's new approach in principle, we must consider its application in this case. The issue is whether individual invocation of a statutory employment right constitutes "concerted activit[y]" under the *Meyers* rule. The NLRB answered this question in the negative. It reasoned that the nexus with group activity *City Disposal* required before holding individual invocation of a collectively-bargained right "concerted" is absent when statutory rights are at issue. *Meyers II*, 281 N.L.R.B. No. 118, slip op. at 18–19.

Were we considering the question *de novo*, we might have considered the opposite view more in keeping with the spirit and purpose of the NLRA. By its own admission, the Board advocates an interpretation of the Act that condones "outrage[ous]" employer conduct. *Meyers I*, 268 N.L.R.B. at 499. The vast majority of American employees are not unionized. They do not work under the protections a collective bargaining agreement often affords. Statutory employment rights provide the only protection they have against the arbitrary power of their employer. As it stands, the NLRB's interpretation of Section 7 would allow management to discharge or otherwise discipline an individual

worker for exercising statutory employment rights.[2]

While disputing its wisdom, we must nevertheless defer to what is a reasonable interpretation. We note, however, that determining the concertedness of a single employee's invocation of a statute must be read in conjunction with the Board's views on when individual action bears sufficient relation to group action to be "concerted."

In reaching its conclusion, the NLRB utilized methodology the Supreme Court developed in *City Disposal*. There, in determining whether individual assertion of a collectively bargained right was "concerted activit[y]," the Court set forth three relevant factors. Each represented a sufficient link with group action to deem the act "concerted." Specifically, the Court found that the invocation in question: (1) was part of a "single collective activity" that started when the union was formed, continued during the negotiation of an agreement, and culminated with the enforcement of that pact; (2) "reenact[ed]" the employees' decision to bargain for the right asserted; and (3) is integrally related to collective action because no right would be available without "the prior negotiating activities of ... fellow employees." *City Disposal*, 465 U.S. at 831–33, 104 S.Ct. at 1511–12. Adopting these three elements as the only possible links to group action, the Board held that in contrast to collectively bargained rights, invocation of a statutory right is not "part of any ongoing employee-generated process such as the negotiation and administration of collective-bargaining agreements." *Meyers II*, 281 N.L.R.B. No. 118, slip op. at 18.

The Board bolstered this interpretation by asserting that statutory rights bear no relation to "actual group activity" in a labor context. Rather, it argued, these rights are related to the legislative process.

---

**2.** One commentator brought out the implications starkly. Analogizing from the temerity of Oliver Twist, he asked:

> What permissibly could become of employee Twist today were he respectfully to ask of his employer, "Please, sir, I want some more"? Could he peremptorily be dismissed for this impertinence in the America of 1985 as if he

were a parish ward in the England of 1835? The answer, in terms of federal labor law, is an unequivocal "yes."

Finkin, Labor Law by Boz—A Theory of *Meyers Industries, Inc., Sears, Roebuck and Co.,* and *Bird Engineering*, 71 Iowa L.Rev. 155, 157 (1985).

*Id.* In the NLRB's view, the only possible link to group acts would be employee lobbying on behalf of the bill. Applying the *City Disposal* factors, the Board then determined that any such efforts were too "remotely related" to group acts to form "concerted activities" because of the intervening legislative process. *Id.* at 18–19 (quoting *City Disposal*, 465 U.S. at 833 n. 10, 104 S.Ct. at 1512 n. 10).

In approving this view, the District of Columbia Circuit reasoned that *City Disposal* "simply recognized that a worker's actions are concerted when tied to the actions of ... fellow employees...." *Prill II*, 835 F.2d at 1484. This holding, in that circuit's view, "neither required nor precluded treating workplace-related statutory rights as establishing, without more, the necessary bond among workers." *Id.* at 1484–85. As a result, the court ruled that it was not inconsistent or unreasonable for the Board to hold that collectively-bargained rights, but not statutory employment rights, "demonstrate[ ] the requisite bond." *Id.* at 1485.

Of course, this position, as the D.C. Circuit also noted, "is by no means the only reasonable[ ] interpretation of section 7." *Id.* at 1484. Instead of relying so heavily on *City Disposal*, the Board might reasonably have argued that such literal reliance was inapposite. *City Disposal* merely discussed how a collectively bargained right is linked to group acts. It did not attempt to consider statutory rights in this context. Nor did the Court give any indication that the three factors set forth constituted an exclusive list of all possible linkages with collective action.

Application of *City Disposal* does not lead inextricably to the NLRB's view. The conclusion that individual invocation of statutory rights bears little relation to the collective process at the core of the Act is not the only reading of the NLRA. Statutory rights form the fabric upon which employees weave the pattern of their collective bargaining agreement. The NLRB, citing *City Disposal*, noted that this process begins when a union is formed and continues during negotiation. It might have also viewed the procedure more comprehensively. A labor-management agreement is not written on a *tabula rasa;* rather, it is created against the background of a panoply of statutory employment rights. Employees, conscious of the milieu in which they decide to organize and bargain, rely on the availability of the enacted rights they already possess.

Looking beyond the three *City Disposal* factors themselves, an equally plausible interpretation might have noted that at the heart of the Supreme Court's analysis stands a broad vision of the "integral aspect[s] of ... [the] collective process." *City Disposal*, 465 U.S. at 835, 104 S.Ct. at 1513. The Court refused to adopt a narrow interpretation of collective bargaining, recognizing that to equalize bargaining power "the entire process envisioned by Congress as the means by which to achieve industrial peace" should be protected. *Id.* at 836, 104 S.Ct. at 1513. As a result, the Supreme Court rejected a literal interpretation of § 7—that the acts of a single employee could not be "concerted"—because it would have excluded numerous forms of individual action crucial to the success of the Act.

This expansive vision of § 7 is not limited to *City Disposal* and collectively bargained rights. Ten years ago, and six years before *City Disposal*, the Supreme Court established a similarly broad interpretation when it construed the meaning of § 7's "mutual aid or protection" clause in *Eastex.* As we noted earlier, *Eastex* held distribution of a union newsletter to be activity for "mutual aid or protection." The Court declined the opportunity to "reject[ ] the idea that § 7 might protect any activity that could be characterized as 'political.'" *Eastex*, 437 U.S. at 564, 98 S.Ct. at 2511. Nor did it hold that under § 7, "the employee is only protected for activity within the scope of the employment relationship." Rather, the Court adopted a far-reaching interpretation as the only one capable of implementing the intent of Congress.

"The 74th Congress knew well enough," as Justice Powell wrote for the Court, "that labor's cause is often advanced on

fronts other than collective bargaining and grievance settlement within the immediate employment context." *Id.* at 565, 98 S.Ct. at 2512. The concern of the *Eastex* Court for the ill effects of a narrow interpretation of § 7 are equally true in this case:

> To hold that activity of this nature is entirely unprotected ... would leave employees open to retaliation for much legitimate activity that could improve their lot as employees. As this could "frustrate the policy of the Act to protect the right of workers to better their working conditions," *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 [82 S.Ct. 1099, 1102, 8 L.Ed.2d 298], (1962), we do not think that Congress could have intended the protection of § 7 to be as narrow as ... [the NLRB] insists.

*Id.* at 566–67, 98 S.Ct. at 2513.

But as noted earlier, if reasonable, we must take the Board's views as we find them, not as we might like them to be. Nevertheless, we note that *Meyers* does protect individual invocation of a statutory employment right in certain situations. Only when individual action lacks the requisite nexus with the collective action fostered by the NLRA will the act be deemed unconcerted.

As the Board noted in *Meyers II*, 281 N.L.R.B. No. 118, at 12–16, and in its brief, there are numerous situations where, applying the *Meyers* rule, individual action will be considered "concerted" because sufficient nexus exists between the act in question and collective action. For example, a lone act is concerted if it stems from prior "concerted activit[y]" or if an individual acts, formally or informally, on behalf of a group. *See, e.g., Every Woman's Place, Inc.*, 282 NLRB No. 48 (Dec. 11, 1986), *enf'd, Every Woman's Place v. NLRB*, 833 F.2d 1012 (6th Cir.1987) (unpublished decision available on WESTLAW); *Consumers Power Co.*, 282 N.L.R.B. No. 24 (Nov. 13, 1986) (individual safety complaint concerted because it was previously discussed at group meeting). The Board has also held that "attempts to initiate, induce, or prepare for group action even where the individual is unable to sway the

group are concerted." *See, e.g., El Gran Combo de Puerto Rico*, 284 N.L.R.B. No. 112 (July 20, 1987); *Vought Corp.–MLRS Systems Division*, 273 N.L.R.B. 1290 (1984), *enf'd, NLRB v. Vought Corp.–MLRS Systems Division*, 788 F.2d 1378 (8th Cir.1986). These cases also apply when statutory rights are at issue.

In *Prill II*, the D.C. Circuit adopted this method of analysis. After approving the *Meyers* rule's application to an individual's invocation of statutory employment rights, the court noted that only a slight change in the facts would have rendered the action "concerted." In that case, as discussed above, Prill was fired for filing a safety complaint with the Tennessee Public Service Commission. The Board found that Prill's action was not concerted because it was individual and lacked the requisite link to group concerns. The court upheld the rule's application based on "the singularity of Prill's case." *Prill II*, 835 F.2d at 1485. "Had Prill simply gotten together with his co-workers to complain about the violation of statutory safety provisions, he would have been protected from dismissal under the Board's current reading of section 7...." *Id.*

The Board has reasonably required some nexus with group action. But we do not in this case address an individual action that in fact relates to a matter which can be demonstrably connected to a pre-existing group concern. The *Meyers* rule prevents personal gripes relating to job conditions and the purely individual invocation of statutory workplace rights from falling within section 7's definition of "concerted activit[y]." But it may well be another matter when, to employees on the jobsite, the subject of the complaint itself has been a topic of group concern that can be proven at an administrative proceeding.

This approach does not apply to Ewing because he was only suspected of acting. His only "crime" was that his employer thought he filed a complaint. His § 8(a)(1) claim is thus based on the chilling effect Darling's actions allegedly had on the exercise of other employees' § 7 right

to engage in "concerted activities ... for mutual aid or protection."

We first point out that contrary to the Board's assertion, evidence does exist that shows that employees were aware of the company's actions. The Union Business Manager learned the reason Darling refused to rehire Ewing through the grapevine. Second, the Board's analysis placed undue emphasis on the employer's view of the situation, focusing on whether Darling thought Ewing's alleged act was linked to the actions of other employees. The key element in a chilling effect analysis should be the impact on the employees.

As already discussed, the Board may abandon the *Alleluia* presumption, which recognized an implied chilling effect, in favor of an objective standard. But we note that the chilling effect, in a case such as this one, is often detected slowly over time and is difficult, if not impossible, to show in the period between the incident and the ALJ's determination. The Board's current view may, with the passage of time be shown to have unintended, and even unreasonable, results. In this case, however, we cannot say that the Board's determination was either unreasonable or not supported by substantial evidence.

## IV.

■ To defeat retroactive application of *Meyers* to his case, Ewing argues that the Board misapplied the 5 factors the court adopted as a guide to determining the question. *See NLRB v. Niagara Machine & Tool Works*, 746 F.2d 143, 151 (2d Cir. 1984). We reject this argument and hold retroactive application proper.

■ The issue of retroactive application requires that we balance any unfairness to Ewing against the benefits of applying the rule in question. To guide this analysis, we employ the following factors:

(1) whether the particular case is one of first impression, (2) whether the new rule presents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against

whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Niagara Machine & Tool Works*, 746 F.2d at 151. Generally, "absent some manifest injustice" discovered on review, we will defer to the Board. *NLRB v. Semco Printing Center, Inc.*, 721 F.2d 886, 892 (2d Cir.1983).

We address each factor in turn. Given the abundant litigation regarding the *Alleluia* presumption that preceded *Darling I*, it cannot be said that the case presented a first impression question. *See, e.g., Ontario Knife Co. v. NLRB*, 637 F.2d 840 (2d Cir.1980); *Krispy Kreme Doughnut Corp. v. NLRB*, 635 F.2d 304 (4th Cir.1980). Moreover, the *Meyers* rule, in our view, falls between an abrupt departure and an interstitial ruling. Ewing, on the other hand, did rely on *Alleluia*. Accordingly, the third factor works in his favor. We note that the Board's assertion that Ewing could not have relied on the rule because he did not actually file a complaint, is specious at best. Regarding the fourth factor, we see no undue burden from retroactive application. Finally, given that the rule stems from the Act's central concerns, a significant statutory interest in retroactive application exists. In sum, we conclude that retroactive application is proper.

## V.

For the foregoing reasons, we hold that the *Meyers* rule presented a reasonable interpretation of the NLRA. And the Board was not unreasonable in so concluding.