897 F.2d 84
 133 L.R.R.M. (BNA) 2753, 58 USLW 2555,
114 Lab.Cas. P 12,014
 NATIONAL LABOR RELATIONS BOARD, Petitioner-Cross-Respondent,
v.
OAKES MACHINE CORPORATION, a Subsidiary of Katy Industries,
Incorporated, Respondent,
James Zuber, Respondent-Cross-Petitioner,
Kenneth Kress and Louis Russo, Intervenors.
 Nos. 68, 69, Dockets 89-4052, 89-4604.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 4, 1989.
Decided Feb. 26, 1990.
 
 David A. Fleischer, Atty., N.L.R.B., Washington, D.C. (Joseph E. Desio, Acting Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner N.L.R.B.
 Bertrand B. Pogrebin, Mineola, N.Y. (Rains & Pogrebin, Richard G. Kass, of counsel), for respondent Oakes Machine Corp.
 Amy Gladstein, New York City (Gladstein, Reif & Meginniss, of counsel), for respondent-cross-petitioner James Zuber and intervenors Kenneth Kress and Louis Russo.
 Before NEWMAN, PRATT, and MAHONEY, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Nearly eleven years ago, in March 1979, respondent Oakes Machine Corporation (Oakes Machine or the company), fired three of its employees--Louis Russo, James Zuber, and Kenneth Kress. This petition to enforce and cross-petition to review the long-delayed board actions on the discharge complaints present one issue with respect to each employee: (1) whether the National Labor Relations Board (NLRB or board) properly regarded as "protected" activity within the meaning of Sec. 7 of the National Labor Relations Act (NLRA or the act), 29 U.S.C. Sec. 157, Russo's mailing of a letter complaining in part that the company's president required employees to spend large amounts of time on his personal projects; (2) whether the NLRB's retroactive application to Zuber of its new definition of "concerted" activity was improper on the facts of this case; and (3) whether Kress, who as a statutory "supervisor" is accorded significantly less protection than an "employee" under the NLRA, was unlawfully discharged because he threatened to testify "in court" on behalf of an employee and he failed to exert sufficient supervisory control to prevent employees from participating in concerted protected activities.
 
 
 2
 For the reasons that follow, we conclude (1) that substantial evidence supports the board's determination that Russo's sending of the letter constituted protected activity within the meaning of Sec. 7 of the NLRA; (2) that retroactive application to Zuber of the board's new, restrictive definition of "concerted" activity was improper on the facts of this case; and (3) that the discharge of Kress, the supervisory employee, was unlawful. We therefore enforce the board's order as to Russo and Kress and deny enforcement as to Zuber.
 
 I. BACKGROUND
 
 3
 The NLRB petitions for enforcement of its April 14, 1988, order finding, inter alia, that Oakes Machine violated Sec. 8(a)(1) of the NLRA in its discharge of employees Russo and Zuber. Zuber cross-petitions for review of that portion of the order which found his discharge to be lawful.
 
 
 4
 The facts of the case, developed at a hearing before an administrative law judge (ALJ) on November 17-21, 1980, are essentially undisputed. Oakes Machine designs, manufactures, and sells sophisticated equipment used in the food, chemical, and foam rubber industries. During the relevant period, the company employed approximately twenty-seven workers. Russo, Zuber, and Kress worked in its engineering department--Russo as a senior draftsman, Zuber as an electronic technician, and Kress as a supervisor and chief engineer. Each was discharged on March 9, 1979.
 
 
 5
 Russo was fired for having sent to Katy Industries, Inc., Oakes Machine's parent company, a letter criticizing company president, W. Peter Oakes, who had replaced his father as president of the company in 1976. Oakes Machine had a long-standing practice of tying annual pay raises and bonuses to company profits. In early 1978, a number of employees complained to each other about the small bonuses granted for 1977; they concluded that profits were low, in part, because Oakes required employees to spend a large amount of working time on Oakes's personal projects, including repairing his airplane, radio, snowplow, bicycles, lawn furniture, and computers. The employees also criticized Oakes's lack of maturity, his inability to handle the responsibilities of his position, and his attitude toward employees and customers.
 
 
 6
 Zuber drafted an anonymous letter to Katy Industries reflecting these complaints. The letter reported in part that Oakes had used company personnel and equipment for personal projects:
 
 
 7
 Since his appointment, [Oakes] has used the Company and its resources solely for his personal gain. He has used Company personnel and stock to help him rebuild his airplane that he is restoring. Many hours have been logged by the welder in the repair of many parts of his airplane and also his lawn mower and lawn furniture. This is a matter of record, not rumor. Many parts of this airplane can be seen scattered all over the shop.
 
 
 8
 Since January, he had concentrated most of his time and part of the Engineering staff's time building a personal computer.
 
 
 9
 The letter also noted other complaints of employees about Oakes, and suggested that Katy Industries reevaluate Oakes's appointment as president. Russo mailed the unsigned letter to Katy Industries during the summer of 1978.
 
 
 10
 Katy Industries sent a copy of the letter to Oakes, who told the company vice president, Edward Egan, that he would fire the person who had written the letter. In December 1978 Oakes learned that it was Russo who had sent the letter, and, true to his word, on March 9, 1979, he fired Russo for that action. Oakes also threatened to send copies of the letter to any prospective employers who might request references on Russo.
 
 
 11
 Zuber and Kress were discharged for their participation in an unrelated incident involving calls to the New York State Nuclear Regulatory Commission and the Suffolk County Health Department by Zuber, who sought to determine the safety of a radioactive component of certain equipment the company was developing. From 1977 to 1979 Oakes Machine had been developing a mechanical device called a densitometer used in the baking industry to ensure uniform density in cake mixes. The densitometer incorporated a radioactive "source" surrounded by a lead shield. The source and shield were encased in a protective metal source holder. In developing the densitometer, Zuber, Russo, Kress, and other employees worked closely with the radioactive source and occasionally moved it from one unit to another.
 
 
 12
 Zuber first expressed concern about the safety of working with the radioactive source in August or September of 1977, but Egan assured him that the source was safe. On February 28, 1979, after reading safety literature about radioactive sources, Zuber concluded that he had been exposed to an unsafe level of radiation. On March 1, 1979, he told his supervisor, Kress, of his concerns, but Kress stated that the company needed more information because Zuber's material dealt with an unshielded source whereas the company used a shielded source.
 
 
 13
 Not satisfied, Zuber immediately convinced another employee to stop working near the source because it might be unsafe. He then called the state Nuclear Regulatory Commission and the Suffolk County Health Department. An official from the county health department visited the company that afternoon, called the state agency, determined that the company had violated state nuclear regulations by moving the radioactive source from one unit to another, and stated that the incident would have to be "logged".
 
 
 14
 The next day, March 2, 1979, Oakes met with Egan and Kress to discuss Zuber's actions. Oakes stated that Zuber was "stupid" to have contacted the health department before talking to Kress and that Zuber would be fired. Kress protested that Zuber had a legal right to contact the department of health and that he, Kress, would testify on Zuber's behalf "in court" if necessary. Oakes closed the discussion by saying he had reported the incident to Katy Industries and that the matter was out of his hands. A week later, on March 9, 1979, Oakes personally fired Russo, Zuber, and Kress for their participation in the above incidents.
 
 
 15
 On March 12, 1979, Zuber filed a complaint with the Occupational Safety and Health Agency (OSHA) alleging that his discharge violated Sec. 11(c)(1) of the Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. Sec. 660(c)(1). Russo and Kress joined in the complaint in protest of their own discharges. On June 26, 1979, Zuber filed a charge with the NLRB, alleging that his discharge for engaging in protected concerted activity violated sections 7 and 8 of the NLRA. Russo and Kress similarly joined in that charge.
 
 
 16
 Thereafter the NLRB submitted the charge to its Division of Operations Management for coordination with OSHA, and the two agencies determined that the matter would be handled by the NLRB alone. Accordingly, on October 16, 1979, OSHA notified Zuber, Russo, and Kress that it would not pursue the case.
 
 
 17
 In a decision dated December 18, 1981, the ALJ determined, inter alia, that Oakes Machine had violated Sec. 8(a)(1) of the NLRA in its discharge of each employee. The company appealed, but the board did not file its decision until April 14, 1988, more than six years after the ALJ's decision and eight years after the filing of the charge. In those intervening six years, the board had overruled its prior policies in two relevant respects. First, it had narrowed its definition of "concerted" activity under Sec. 7 of the act. Applying the newer, more stringent definition, the board held that Russo's sending of the letter to Katy Industries was "concerted" but that Zuber's calls to the two agencies were not. It therefore affirmed as to Russo but reversed and dismissed the complaint as to Zuber.
 
 
 18
 In its second policy change, the board narrowed the circumstances in which discharge of a supervisory employee might be found unlawful. Under the old rule, the ALJ had found both reasons proffered by the company to justify its discharge of Kress to be unlawful. Under the new rule, only one of the two reasons--Kress's threat to testify on Zuber's behalf--was unlawful; the other reason--Kress's failure to adequately supervise Russo and Zuber--was now a permissible ground for discharge. Viewing the case for the first time as a mixed motive case, the board held that Kress's discharge was unlawful because Oakes Machine would not have terminated Kress for the permissible reason alone. See Wright Line, A Division of Wright Line, Inc., 251 N.L.R.B. 1083 (1983), enf'd, NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).
 
 
 19
 The board now petitions for enforcement of its order, and Zuber cross-petitions for review of that portion of the order which found his discharge lawful. For the reasons stated below, we enforce the NLRB's order with respect to Russo and Kress, but deny enforcement with respect to Zuber.
 
 II. DISCUSSION
 
 20
 A. Russo's Discharge for Sending the Letter to Katy Industries
 
 
 21
 Oakes Machine asserts that the board erred in determining that it violated Sec. 8(a)(1) of the act by discharging Russo for sending the anonymous letter to Katy Industries. Section 8(a)(1) provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Sec. 7 of the act]". 29 U.S.C. Sec. 158(a)(1). Among the rights guaranteed to employees by section 7 is the right "to engage in * * * concerted activities for * * * mutual aid or protection". 29 U.S.C. Sec. 157.
 
 
 22
 A violation of Sec. 8(a)(1) is established if (1) the employee's activity was concerted; (2) the employer was aware of its concerted nature; (3) the activity was "protected" by the act; and (4) the discharge or other adverse personnel action was motivated by the protected activity. Meyers Industries, Inc., 268 N.L.R.B. 493, 497 (1984), remanded sub nom., Prill v. NLRB, 755 F.2d 941 (D.C.Cir.1985), on remand, Meyers Industries, Inc., 281 N.L.R.B. 882 (1986), enf'd, Prill v. NLRB, 835 F.2d 1481 (D.C.Cir.1987), cert. denied, 487 U.S. 1205, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988). The company does not dispute that Russo's activity was concerted, that it knew the activity was concerted, or that Russo's discharge was motivated by his letter to Katy Industries. It argues only that the sending of the letter was not "protected" under the act because it was not sufficiently related to terms and conditions of employment and because the employees were seeking an impermissible goal, the removal of a "high level" supervisor.
 
 
 23
 Employee action seeking to influence the identity of management hierarchy is normally unprotected activity because it lies outside the sphere of legitimate employee interest. In a narrow category of cases, however, concerted activity to protest the discharge of a supervisor, see, e.g., Abilities and Goodwill, Inc. v. NLRB, 612 F.2d 6, 8 (1st Cir.1979); NLRB v. Okla-Inn, 488 F.2d 498, 502-03 (10th Cir.1973); Dobbs Houses, Inc. v. NLRB, 325 F.2d 531, 537 (5th Cir.1963); NLRB v. Guernsey-Muskingum Electric Co-operative, Inc., 285 F.2d 8, 11-12 (6th Cir.1960); NLRB v. Phoenix Mutual Life Insurance Co., 167 F.2d 983, 988 (7th Cir.), cert. denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948), or to effect the discharge or replacement of a supervisor, see Hoytuck Corp., 285 N.L.R.B. No. 120 n. 3 (1987), may be "protected", provided the identity of the supervisor is directly related to terms and conditions of employment.
 
 
 24
 Whether employee activity aimed at replacing a supervisor is directly related to terms and conditions of employment is a factual inquiry, based on the totality of the circumstances, including (1) whether the protest originated with employees rather than other supervisors; (2) whether the supervisor at issue dealt directly with the employees; (3) whether the identity of the supervisor is directly related to terms and conditions of employment; and (4) the reasonableness of the means of protest. NLRB v. Sheraton Puerto Rico Corp., 651 F.2d 49, 51-52 (1st Cir.1981); Abilities and Goodwill, 612 F.2d at 8-9; Okla-Inn, 488 F.2d at 502-03.
 
 
 25
 Our review of the board's determination that Oakes's conduct directly impacted upon employee working conditions is narrowly confined. We must uphold the board's determination if supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 492-96, 71 S.Ct. 456, 466-69, 95 L.Ed. 456 (1951); Local One, Amalgamated Lithographers of America v. NLRB, 729 F.2d 172, 176 (2d Cir.1984); NLRB v. Donald E. Hernly, Inc., 613 F.2d 457, 461-62 (2d Cir.1980).
 
 
 26
 Under the circumstances of this case, the identity of president Oakes was within the realm of proper employee interest. The concern over working conditions originated with employees rather than other supervisory personnel; Oakes dealt directly with employees, at least to the extent that he assigned them projects unrelated to company work; and the employees' conduct, the sending of a letter, was reasonable.
 
 
 27
 Further, contrary to the company's contentions, substantial evidence supports the board's determination that Oakes's conduct was directly related to employee working conditions. The letter sent to Katy Industries devoted several paragraphs to Oakes's diversion of company resources and personnel away from potentially profitable company projects, in order to advance Oakes's own personal projects. Specifically, the letter emphasized that Oakes required employees to repair his airplane, lawn mower, and lawn furniture, and also assigned members of the engineering staff to build a personal computer for him. Other credited testimony revealed that the employees' annual pay raises and bonuses were tied to company profitability; that in 1977 employees had received no annual raise because the company had not been profitable; that in February or March 1978, a number of employees had complained among themselves about the small bonuses received that year, blaming the decrease in part on the amount of time Oakes had required them to spend working on his personal projects; and that the letter Russo sent was drafted to reflect these concerns. Thus, although the letter did not specifically state that Oakes's diversion of personnel and resources to personal projects had reduced employees' salaries, that inference was permissible, if indeed, not compelled, so that substantial evidence supports the board's conclusion that Oakes's conduct was directly related to terms and conditions of employment.
 
 
 28
 Finally, on the exceptional facts of this case, Oakes's status as a "high level" supervisor cannot insulate him from the concerted action taken. Although employees customarily have no interest in the identity of high level management, that is because those supervisors generally have no direct effect on conditions of employment. In Abilities and Goodwill, however, the court noted that although "we are presented here with an employee protest over the discharge of the second highest ranking management official[ ], [t]hat circumstance is * * * somewhat diminished in significance; despite [his] rank, he was apparently not insulated from direct employee contact. Thus, from the employees' perspective, [his] position and nexus to their working conditions was arguably similar to that of a low level supervisor." 612 F.2d at 9. Similarly, despite Oakes's position as company president, he did have direct contact with employees, and his activities paralleled those of a low level supervisor at least to the extent that he made some job assignments--those in which he removed employees from projects which were potentially profitable and reassigned them to unprofitable personal projects. Where, as here, a high level supervisor directly affects working conditions by tying salary increases to company profitability and then preventing employees from working on profitable company projects, he is vulnerable to concerted employee action that seeks to improve working conditions.
 
 
 29
 B. Zuber's Discharge for Contacting Health Agencies
 
 
 30
 Zuber asserts, contrary to the board's decision, that his calls to various regulatory agencies about potentially unsafe levels of radiation in the workplace constitute protected "concerted" activity even within the narrower definition of "concerted" adopted by the board in Meyers Industries, Inc., 268 N.L.R.B. 493 (1984) and reaffirmed on remand in Meyers Industries, Inc., 281 N.L.R.B. 882 (1986). Alternatively, he contends that retroactive application of the Meyers standard is inappropriate because manifestly unjust on the facts of this case.
 
 
 31
 In December 1981, applying the now-discredited standard of Alleluia Cushion Co., Inc., 221 N.L.R.B. 999 (1975), which deemed individual efforts to invoke state or federal occupational safety regulations to be "concerted", the ALJ determined that Zuber's conduct here constituted protected "concerted" activity under Sec. 7 of the act and that his discharge was therefore unlawful. Over six years passed while the board processed the appeal. Then, applying its newly developed standard set forth in Meyers, that activity is "concerted" only if "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself", the board held that Zuber's actions were not "concerted" and that his discharge was therefore lawful. Because we hold that retroactive application to Zuber of the new Meyers rule was improper, we do not reach the close question of whether Zuber's conduct was "concerted" under the Meyers standard.
 
 
 32
 In determining whether to give retroactive effect to an agency decision, this circuit weighs the following five factors:
 
 
 33
 (1) whether the particular case is one of first impression, (2) whether the new rule presents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 34
 WPIX, Inc. v. NLRB, 870 F.2d 858, 866 (2d Cir.1989) (quoting Ewing v. NLRB, 861 F.2d 353, 362 (2d Cir.1988) (quoting in turn NLRB v. Niagara Machine & Tool Works, 746 F.2d 143, 151 (2d Cir.1984))). Absent manifest injustice, we defer to the board's determination. Ewing, 861 F.2d at 362 (quoting NLRB v. Semco Printing Center, Inc., 721 F.2d 886, 892 (2d Cir.1983)).
 
 
 35
 It is undisputed that Zuber was fired solely because he sought safety information from the New York Nuclear Regulatory Commission and the Suffolk County Health Department. Following his discharge, Zuber filed a timely complaint with OSHA asserting that his discharge violated Sec. 11(c)(1) of the OSH Act, which provides:
 
 
 36
 (1) No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.
 
 
 37
 He also filed a timely charge with the NLRB asserting that his actions constituted protected concerted activity under sections 7 and 8 of the NLRA. Under the law of both agencies as interpreted and applied at that time, Zuber would appear to have been unlawfully discharged.
 
 
 38
 In 1975 OSHA and the NLRB had entered into a joint "Memorandum of Understanding", which prescribed procedures for handling cases potentially violative of both Sec. 11(c)(1) of the OSH Act and sections 7 and 8 of the NLRA. The avowed purposes of the agreement were to avoid duplicate litigation and to "insure that employee rights in the area of safety and health will be protected". In furtherance of the goal of protecting employee safety and health rights, the joint agreement provided that "since an employee's right to engage in safety and health activity is specifically protected by the OSH Act and is only generally included in the broader right to engage in concerted activities under the NLRA, it is appropriate that enforcement actions to protect * * * safety and health activities should primarily be taken under the OSH Act rather than under the NLRA." Ensuing provisions of the agreement prescribed that the NLRB would, absent the employee's own withdrawal of the matter, defer to OSHA. In Zuber's case, however, the two agencies contravened the general policy of their joint agreement, and decided that OSHA would defer to the NLRB. They did so, ironically, because his "rights [might be] vindicated more quickly through Board processes than [by OSHA]".
 
 
 39
 Not only did this decision deprive Zuber of the statutory protection that the OSH Act provides to an employee who, acting alone, reports violations of his employer, but, in effect, it failed to provide him the prompt disposition contemplated by OSHA's deferral; in fact, the case languished in the NLRB's administrative proceedings for over eight years.
 
 
 40
 To make matters worse, the board does not even dispute that at the time of the deferral decision, Zuber could have succeeded on his claim under either the NLRA or the OSH Act and could have obtained identical relief in either forum, had OSHA decided this case in the first instance or had the board not delayed unreasonably.
 
 
 41
 Under these circumstances, retroactive application of the Meyers rule to Zuber would be manifestly unjust. With respect to the five factors governing retroactivity, even assuming, under the first factor, that the issue is not one of first impression, and that the second factor is neutral because the rule falls between an abrupt departure and an interstitial ruling, Ewing, 861 F.2d at 362, the other three factors dominate this case and mandate reversal.
 
 
 42
 Under the third factor, Zuber and, indeed, both agencies reasonably relied on the continued vitality of the Alleluia rule. Although Zuber filed with both OSHA and the NLRB, he was permitted by the agencies to pursue only his claim before the NLRB because that route would purportedly provide a speedier resolution of the issue. As noted above, the joint agreement contemplated that OSHA would usually handle workplace safety matters because the OSH Act, unlike the NLRA, specifically protects safety and health complaints. Zuber reasonably relied on the agencies' assessment of the issue. That reliance, coupled with the NLRB's subsequent delay of over eight years in deciding the case during which it overruled the Alleluia Cushion rule crucial to Zuber's workplace safety claim, weighs heavily against retroactive application of the Meyers rule. See Oil, Chemical and Atomic Workers International Union v. NLRB, 842 F.2d 1141, 1145 (9th Cir.1988) (NLRB delay of four years during which it overruled prior policy a factor in court's determination that retroactive application of new board policy is inappropriate). Finally, as to the fourth and fifth factors, given OSHA's and the NLRB's avowed goal of vindicating employee safety and health complaints, the burden that retroactive application of Meyers would impose is strong and the statutory interest in applying the new rule on these facts is particularly weak.
 
 
 43
 In summary, retroactive application of the Meyers rule would be manifestly unjust given the joint agency determination that Zuber could not pursue his then-valid claim before the OSHA, the agencies' declared goal of insuring vindication of employee safety complaints, Zuber's reasonable reliance on the agency determination, and the inordinate board delay.
 
 
 44
 The board concedes that under prior law, Zuber's actions were concerted. Accordingly, having determined that retroactive application of the Meyers rule is inappropriate, we deny enforcement of the board's order with respect to Zuber.
 
 C. Discharge of Supervisor Kress
 
 45
 The company opposes enforcement of the board's order as to Kress, contending that it lawfully discharged Kress, who was a statutory supervisor under 29 U.S.C. Sec. 152(11), and thus was excluded under the 1947 Taft-Hartley amendments to the National Labor Relations Act from the protections afforded to other employees under the act. See Beasley v. Food Fair of North Carolina, Inc., 416 U.S. 653, 659-60, 94 S.Ct. 2023, 2026-27, 40 L.Ed.2d 443 (1974) (supervisors not protected by NLRA "because supervisors [are] management obligated to be loyal to their employer's interests * * * "); see also Florida Power & Light v. Electrical Workers, 417 U.S. 790, 806-10, 94 S.Ct. 2737, 2745-47, 41 L.Ed.2d 477 (1974). An exception to this statutorily imposed exclusion of supervisors from the protection of the NLRA, however, is the long-standing board policy that an employer may not discharge a supervisor in retaliation for his testimony or his threat to testify in board proceedings. See, e.g., King Radio Corp., Inc. v. NLRB, 398 F.2d 14, 21-22 (10th Cir.1968); Oil City Brass Works v. NLRB, 357 F.2d 466, 470-71 (5th Cir.1966); Glover Bottled Gas Corp., 275 N.L.R.B. 658 n. 7, 669, 672 (1985), enf'd mem., 801 F.2d 391 (2d Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); Orkin Exterminating Co., Inc., 270 N.L.R.B. 404 & n. 5 (1984); Modern Linen & Laundry Service, Inc., 116 N.L.R.B. 1974, 1975 (1956), on remand from Pedersen v. NLRB, 234 F.2d 417 (2d Cir.1956); Better Monkey Grip Co., 115 N.L.R.B. 1170, 1171 (1956), enf'd, 243 F.2d 836 (5th Cir.), cert. denied, 355 U.S. 864, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957). In this appeal, Oakes Machine asserts that the protection of the NLRA does not extend to Kress because he threatened to testify "in court" rather than at board proceedings. It also asserts that the board erred in applying a Wright Line mixed motive test without giving a detailed analysis of the facts supporting its conclusions. We reject both assertions.
 
 
 46
 First, the board held that the discharge of Kress for threatening to testify "in court" on Zuber's behalf violated Sec. 8(a)(1) of the act because "in court" included, by reasonable implication, "proceedings within the ambit of the National Labor Relations Act." We are satisfied that in this case substantial evidence supports the board's interpretation that Kress's use of the term "in court" included board proceedings. Kress's statement, therefore, constituted an impermissible basis for his discharge. We thus need not consider the more generalized issue raised by Oakes Machine of whether the board broadened its protection for testifying supervisors to every instance in which a supervisor may assert that he will testify "in court".
 
 
 47
 We reject as well Oakes Machine's final argument that, on the facts of this case, the board's scanty Wright Line analysis requires reversal. At the time of the ALJ's decision, board policy precluded the discharge of a supervisor if the discharge was part of "a pattern of conduct aimed at coercing employees in the exercise of Section 7 rights". See DRW Corporation, 48 N.L.R.B. 828, 829 (1980); accord Production Stamping, Inc., 239 N.L.R.B. 1183, 1193 (1979). Relying in part on the board's "pattern of conduct" cases, the ALJ determined that Oakes Machine had discharged Kress for two reasons, both unlawful: (1) his stated intention to testify "in court" on Zuber's behalf, and (2) his failure to establish sufficient control over employees Russo and Zuber to require them to follow a chain of command which would have prevented Russo's letter to Katy Industries and Zuber's complaints to regulatory agencies. Accordingly, the ALJ determined that Kress's discharge violated Sec. 8(a)(1) of the act. The board rejected its "pattern of conduct" analysis for supervisory discharge cases during the six-year delay before issuing its decision here, and held instead that the discharge of a supervisor is unlawful only when "it interferes with the right of employees to exercise their rights under Section 7 of the Act as when they give testimony adverse to their employer's interest or when they refuse to commit unfair labor practices." Parker-Robb Chevrolet, Inc., 262 N.L.R.B. 402, 404 (1982), enf'd sub nom., Automobile Salesmen's Union v. NLRB, 711 F.2d 383 (D.C.Cir.1983). Applying its new Parker-Robb yardstick for measuring the lawfulness of supervisory discharges, the board determined that only one of the credited reasons for Kress's discharge--his threat to testify on Zuber's behalf--was unlawful. Then faced with a mixed motive problem, the board applied the analysis set forth in Wright Line, 251 N.L.R.B. 1083 (1980), and approved by the Supreme Court in NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).
 
 
 48
 Under the Wright Line test, the burden is initially on the general counsel to prove by a preponderance of the evidence that conduct protected by Sec. 7 of the act was "a substantial or a motivating factor in the discharge." Id. at 400, 103 S.Ct. at 2473. The burden then shifts to the employer to prove by a preponderance of the evidence "that the discharge would have occurred in any event and for valid reasons." Id. With minimal analysis, the board concluded that Kress's discharge remained unlawful under Sec. 8(a)(1) of the act because Oakes Machine had not established by a preponderance that it would have discharged Kress in any event for the valid reason of failure to adequately supervise.
 
 
 49
 Although it would have been preferable for the board to explain more fully its analysis, we are satisfied that its conclusion, that Kress would not have been discharged for the lawful reason alone--his failure to adequately supervise Russo and Zuber--is supported by substantial evidence on the record considered as a whole. Universal Camera, 340 U.S. at 485-86, 492-96, 71 S.Ct. at 463, 466-69; Local One, Amalgamated Lithographers, 729 F.2d at 175-76; Donald E. Hernly Inc., 613 F.2d at 461-62.
 
 
 50
 The board adopted the ALJ's findings of fact with respect to Kress's discharge. Although, as the board noted, the ALJ at one point found that the failure to adequately supervise Russo and Zuber constituted Oakes's "primary dissatisfaction" with Kress, he also found that Kress's threat to testify in court was a "concurrent reason" for the discharge. Other facts of record confirm that, absent the threat to testify, Kress would not have been discharged. First, the credited testimony reveals that Oakes knew in December 1978 that Russo had sent the letter to Katy Industries. Despite his additional knowledge that Kress had failed to prevent the sending of the letter, Oakes never talked to Kress about the problem, indicated dissatisfaction with Kress's managerial skills, or sought to fire him on that basis until March 9, 1979--one week after Kress said he would testify on Zuber's behalf.
 
 
 51
 Second, after Oakes learned of Zuber's calls to outside agencies, he met with the company vice president and Kress to discuss the matter. It was during this meeting that Kress stated that he would testify on Zuber's behalf if necessary. The ALJ found that Oakes had decided to discharge both Russo and Zuber prior to the meeting but made no such finding with respect to Kress. The fact that Kress was included in the meeting, combined with the fact that Oakes had decided prior to the meeting to discharge both Russo and Zuber but had not at that point decided to fire Kress, supports the board's conclusion that Kress would not have been fired solely for failing to adequately supervise, absent his statement that he would testify for Zuber.
 
 
 52
 Finally, the ALJ specifically found that Oakes had never criticized Kress for inadequate leadership qualities. Based on these facts, which the board adopted and the company does not contest on appeal, we are satisfied that the board's Wright Line analysis is supported by substantial evidence on the record as a whole. Accordingly, we enforce the board's order with respect to Kress.
 
 III. CONCLUSION
 
 53
 Enforcement of the order is granted with respect to Russo and Kress, but denied with respect to Zuber.